STONEWALL LIFE INS. CO. *v.* COOKE.

(Division B. Nov. 7, 1932. Suggestion of Error Overruled Jan. 2, 1933.)

[144 So. 217. No. 29987.]

622

E. H. Green, of Cleveland, and Brunini & Hirsch, of Vicksburg, and J. D. Frank, of Ft. Wayne, Indiana, for appellant.

624

Shands, Elmore & Causey, of Cleveland, for appellee.

628

Argued orally by **J. B. Brunini**, for appellant, and by **Audley Shands**, for appellee.

**Anderson, J.**, delivered the opinion of the court.

Appellee brought this action against appellant in the circuit court of Bolivar county on two life insurance policies for twenty-five thousand dollars each, issued and delivered by appellant to the husband of the appellee, J. W. Cooke, Sr., in which policies appellee was named as the beneficiary. A trial was had on the pleadings and the evidence, resulting in a verdict and judgment in favor of the appellee for the face value of the policies with interest, aggregating the sum of fifty-one thousand

one hundred sixty-six dollars and thirty-three cents. From that judgment appellant prosecutes this appeal.

It will probably be well to have in mind from the start the following facts: The insured, J. W. Cooke, Sr., and his wife, appellee, lived near Merigold in Bolivar county. There were two sons and a daughter, J. W. Cooke, Jr., often referred to in the record as Will Cooke, and Fred Cooke, and the daughter, Mrs. Robertson, who had a son about ten years of age. The two sons, Will and Fred Cooke, were engaged in the planting and supply business, the firm name being Cooke Bros.; they had a plantation near Merigold in Bolivar county, there they lived and had their store and principal place of business. They also owned a plantation near Holly Ridge in Sunflower county. The daughter, Mrs. Robertson, lived at or near Holly Ridge. The insured had no business of his own, he had retired, and his activities consisted in helping his children along in their business; especially he was rendering Cooke Bros. material aid in conducting their farming operations.

Appellant's home office is in Vicksburg. Appellant is incorporated under the laws of this state. John A. Hennessy is president of appellant company; Homer Smith is its cashier and bookkeeper; and W. F. Davis was appellant's agent who wrote the policies involved and collected the first premiums. The face value of the policies is twenty-five thousand dollars each. The premium on one was one thousand two hundred fifty-one dollars and seventy-five cents, on the other one thousand three hundred seventy dollars, aggregating two thousand six hundred twenty-one dollars and seventy-five cents. The policies were issued and delivered to the insured on the 18th day of April, 1930. The premiums were due on the 18th day of April of each year, with a grace period of thirty days. If paid quarterly, the amount of the premiums was six hundred ninety-one dollars and fifty-seven cents.

Cooke Bros. was largely indebted to the Grenada Bank. The insured was on their paper to the bank, and these two insurance policies had been assigned to the bank as collateral security for that indebtedness. The distance from Merigold in Bolivar county to Holly Ridge in Sunflower county is something like thirty-five or forty miles. The insured died suddenly on May 19, 1931, at Holly Ridge while visiting in the home of his daughter, Mrs. Robertson. The annual premiums were due on the 18th day of April of that year. The grace period therefore expired on the 18th day of May following. The insured died the next day.

Appellant's defense was that the policies had lapsed because of default in the payment of the second annual premiums. In reply to that defense, appellee undertook, by her evidence, to show that: (1) Appellant had waived the forfeiture provision in the policies, and that within the waived time the premiums were paid by the Grenada Bank for the insured; (2) Fred Cooke, one of the insured's sons, had paid the premiums before the expiration of the grace period; and (3) the insured himself had paid the premiums before the expiration of the grace period.

Each of those alleged payments will be considered separately, but before doing so the principles of law applicable to forfeiture provisions of insurance policies should be understood. A life insurance policy is not a contract to be renewed from year to year by the payment of the premiums. The contract is entire, and failure to pay a premium does not forfeit the policy unless the policy expressly so provides. Haas v. Mutual Life Ins. Co., 84 Neb. 682, 121 N. W. 996, 26 L. R. A. (N. S.) 747, 19 Ann. Cas. 58; 14 R. C. L. 975, par. 148; 37 C. J. 472, par. 189. The policies here involved do so provide. Such a stipulation constitutes a forfeiture provision. John Hancock Mutual Life Ins. Co. v. Chevillon (C. C. A.), 45 F. (2d) 980; Brams v. New York Life Ins. Co., 299 Pa. 11,

148A 855; New York Life Ins. Co. v. O'Dom, 100 Miss. 219, 56 So. 379, Ann. Cas. 1914A, 583. The words "lapse" and "forfeiture" are used in these policies synonymously; they contain this provision, "this policy shall not lapse or become forfeited," etc. Forfeitures are looked upon by the courts with disfavor. Morgan v. Independent Order, 90 Miss. 864, 875, 44 So. 791. A forfeiture does not take place at all events, the provision is for the benefit of the insurer. The insurer may waive it. If the premiums are not paid when due, the policy is not void but only voidable at the option of the insurer. Grigsby v. Russell, 222 U. S. 149, 32 S. Ct. 58, 56 L. Ed. 133, 137, 36 L. R. A. (N. S.), 642, Ann Cas. 1913B, 863; Reliance Life Ins. Co. v. Wolverton, 88 Colo. 353, 296 P. 793, 795; Knights of Pythias v. Quinn, 78 Miss. 525, 29 So. 826. It is not necessary that the waiver of the forfeiture provision by the insurer be based upon a valuable consideration; "it need not be found upon a new agreement or be supported by a consideration." Equitable Life Assur. Soc. v. Ellis, 105 Tex. 526, 147 S. W. 1152, 1157, 152 S. W. 625; Knickbocker Life Ins. Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689, 692.

It is not necessary for the insured "to have been misled for a waiver of the forfeiture to be effected;" the facts need not constitute an estoppel. Equitable Life Assur. Soc. v. Ellis, supra; Knickbocker Life Ins. Co. v. Norton, supra; United States F. & G. Co. v. Miller, 237 Ky. 43, 34 S. W. (2d) 938, 940, 76 A. L. R. 12; United Order, etc., v. Hooser, 160 Ala. 334, 49 So. 354, 359.

We think the reasoning of the court in Equitable Life Assur. Soc. v. Ellis is sound. In that case the court held that the question was one of waiver, and it was not necessary that the insured be misled in order for a waiver of a forfeiture to be accomplished; that the issue of waiver was not to be determined by what the insured did or omitted to do; that it should be considered only in the light of what the insurance company did; that the in-

sured had no power to waive the forfeiture, and his conduct or mental condition could have no probative force upon the question as to what the insurance company did or intended to do; that the insurance company had the power to waive, its action alone would constitute a waiver; that a waiver is essentially unilateral in its character, and results as a legal consequence from some act or conduct of the insurance company against whom it operates, and no act of the insured in whose favor it is made is necessary to complete it; and that a waiver need not be founded upon a new agreement or supported by a consideration, nor is it essential that it be based upon an estoppel.

In United States F. & G. Co. v. Miller, supra, the Supreme Court of Kentucky held that a waiver of forfeiture by the insurance company was irrevocable; that it was in the nature of an election. The court used this language: "The waiver on a ground of forfeiture by treating the contract thereafter as a continuing obligation partakes of the principle of election, and like an election cannot be retracted." Our court said in Knights of Pythias v. Quinn, supra, that a waiver was a thing "implying an election." If the insurance company has notice of the fact or facts which work a forfeiture at its option, any statement or conduct on its part inconsistent with forfeiture but consistent with nonforfeiture will constitute a waiver of the forfeiture. "The law will never recognize one where the party claiming the forfeiture has not itself at every stage recognized it and insisted upon it." Bailey v. Sovereign Camp, 116 Tex. 160, 286 S. W. 456, 288 S. W. 115, 116, 47 A. L. R. 876, 885.

Slight circumstances of intention to waive a forfeiture will be sufficient. The law "will seize upon slight circumstances as evidence of such intention." Equitable Life Assur. Soc. v. Ellis, supra; United Order, etc., v. Hooser, supra; Kansas City Life Ins. Co. v. Elmore (Tex.

Civ. App.), 226 S. W. 709, 719. "Very slight evidence will suffice to support a finding that a waiver of the right of forfeiture has occurred." Martin v. New York Life Ins. Co., 30 N. M. 400, 234 P. 673, 676, 40 A. L. R. 406, 411.

The evidence bearing on the question of waiver was substantially as follows: The grace period of thirty days provided for in the policies expired on the 18th day of May, 1931. The insured died on the next day, the 19th day of May. As above stated, these insurance policies were held by the Grenada Bank as collateral for a large indebtedness due the bank by Cooke Bros., and the insured, and therefore the bank was interested in the policies being kept alive. On the 20th day of May, the day after the death of the insured, Mr. Adams, the cashier of the bank, called up appellant's office in Vicksburg over the telephone for the purpose of ascertaining whether or not the premiums on the policies had been paid. Mr. Smith, appellant's cashier and bookkeeper, answered the telephone. Mr. Adams testified as follows with reference to the conversation which took place between Smith and himself: "I asked him if he had received a check in payment of the premiums on Mr. Cook's policies. He said he had not. I asked him then if the policies had expired—if they had been cancelled. He said they had not. I said then, if Mr. Cooke will send in a check will the policies go on just like they were. He assured me they would and asked me to use my influence to get him to pay these premiums." The witness testified further that Smith said the premiums would be accepted, in that connection using this language: "Oh, yes, we always give six or seven days after the policies lapse that way before it is cancelled."

Smith, as a witness on behalf of appellant, denied that he told Adams the company always gave six or seven days after the expiration of the grace period for the payment of premiums. He testified that he told Adams he did not know whether the policies had lapsed or not. At

the time of this conversation between Adams and Smith, neither one knew that Mr. Cooke, the insured, was dead. Shortly afterwards, and on the same day, Adams learned of the death of Mr. Cooke. He then telephoned a bank in Vicksburg to pay the premiums on these policies and charge the amount to the Grenada Bank. This was done by the bank at Vicksburg in this manner: That bank credited appellant with the amount of the two premiums, two thousand six hundred twenty-one dollars and seventy-five cents, and delivered to appellant a deposit slip for that amount. Thereupon appellant issued and delivered to the bank at Vicksburg its receipts for the premiums on these two policies, setting forth the number of each policy and the amount of its premium. These receipts were dated April 18th, the date the premiums were due without adding the grace period. This transaction was under the eye of Mr. Hennessy, the president of appellant company, and the receipts were signed by him as president and by Smith as cashier and bookkeeper; they were forwarded by the bank at Vicksburg to the Grenada Bank, and were introduced in evidence on the trial of this case. At the time the premiums were paid in this manner, Mr. Adams did know of the death of Mr. Cooke on the day before, but neither appellant company nor the bank at Vicksburg knew of that fact.

On Thursday of the same week, the 21st of May, appellant received a letter from the insured inclosing the check of Cooke Bros. on the Grenada Bank for these premiums. The check was for the correct amount, two thousand six hundred twenty-one dollars and seventy-five cents. This check was therefore received on the second day after the death of Mr. Cooke. The facts and circumstances surrounding the writing of this letter and the sending of this check will be more fully hereinafter set out in discussing another question in the case. Mr. Hennessy, the president of the appellant company, received and handled this letter and check himself, accord-

ing to his testimony. He stated that he did not cash the check because the premiums had already been paid by the Grenada Bank. Later on the same day, or the next day, which was the 22d of May, appellant learned for the first time of the death of the insured. When it learned of this, it attempted to rescind the payment of the premiums made by the Grenada Bank, tendering the amount back to the bank, and it returned Cooke Bros.' check for the amount of the premiums, claiming that the policies had been forfeited when these payments were made; that under the law appellant was not bound by the Grenada Bank payment, because, at the time it was accepted, appellant did not know of the death of the insured.

Appellant invokes the well-established principle approved by the courts generally as well as by this court that payment of an overdue premium after the death of the insured, where it is stipulated in the contract (as it is in the policies here involved) that the insurance shall be forfeited in case of nonpayment of the premiums when due, will not save the forfeiture, unless there be a waiver or an agreement which may be construed to have that effect, especially where the death or loss is unknown to the insurer. Appellant objected to all evidence tending to show payment after the death of the insured. It contends that the rights of the parties became fixed at that time, and nothing said or done thereafter could be construed into a waiver of the forfeiture provision in the policies. Knights of Pythias v. Quinn, 78 Miss. 525, 29 So. 826; 32 C. J., sec. 629, p. 1351; 3 Couch on Insurance, sec. 635, p. 2051. Appellee concedes the soundness of this principal, but contends that it is not controlling in this case, because the evidence either established, or tended to establish, the fact that the waiver of the forfeiture took place before the death of the insured, and what occurred after his death was competent, along with the other evidence in the case, to

establish that fact. We agree with appellant's contention. It is supported by ample authority. The evidence of what occurred after the death of the insured was not admissible to show that a waiver occurred then, but was competent for the purpose, in connection with the other evidence, to show that at that time a forfeiture had not taken place, but that a waiver of the forfeiture provision in the policies had taken place before the death of the insured. Wright v. Metropolitan Life Ins. Co., 204 Mo. App. 124, 221 S. W. 383-385; Jones v. Supreme Lodge Knights of Honor, 236 Ill. 113, 86 N. E. 191, 193, 127 Am. St. Rep. 277; O'Donnell v. Kansas City Life Ins. Co. (Mo. App.), 277 S. W. 973, 975; Illinois Life Ass'n v. Wells, 200 Ill. 445, 65 N. E. 1072, 1073, et seq.

In the Wright case the insurance company accepted the premium after the death of the insured, without the knowledge of his death, without requiring proof of insurability. The court held that evidence of those facts was competent, not for the purpose of showing a waiver of the forfeiture provision of the policy after the death of the insured, but as tending to show such a waiver before his death. In the Jones case, the court held that the acceptance by the insurance company of the premium after the death of the insured, without knowledge of the death, could be shown, not "for the purpose of proving a new contractual relation between the insured or his beneficiaries and the company, *but for the purpose of showing that the company did not at that time regard the policy as having been forfeited.*" (Italics ours.) In the O'Donnell case the court held that such evidence was competent for the purpose of showing whether the company had waived the forfeiture provision in the policy before the death of the insured. The facts in the Wells case were substantially as follows: Wells was the insured; shortly after his death a friend of his went to the office of the insurance company and asked if

the policy was still in force; the officer of the company answering the question stated that there were some unpaid premiums still due which were a lien against the policy, but, if they were paid, the policy would remain in force; the insurance company did not know Wells was dead at the time. The court said, among other things, "whether they did or not could make no difference as to the competency of this testimony and its legal effect. It was not offered for the purpose of proving any new contractual relations between the insured and the company, but simply for the purpose of showing that the company *did not at that time regard the policy as having been forfeited.*" (Italics ours.)

Such evidence was admissible as tending to show appellant's state of mind before the insured's death, not afterwards. The evidence tended to show that these were the largest premiums due appellant for the month. Appellant was very anxious to collect the premiums; that fact was admitted by appellant. The policies had a provision for reinstatement, in case of forfeiture, upon presentation of satisfactory evidence of insurability. Appellant accepted the premiums from the Grenada Bank without requiring such evidence. Appellant received Cooke Bros.' check for the premiums three days after the grace period had expired. Mr. Hennessy, the president of the company, admitted as a witness on behalf of appellant that he did not cash this check because the Grenada Bank had already paid the premiums. According to Mr. Adams' testimony, Smith, the cashier and bookkeeper of appellant company, on the day after the insured's death, told Mr. Adams, the cashier of the Grenada Bank, that the premiums on these policies had not been paid, and requested that he urge their payment, and stated that, although the grace period had expired, appellant always gave six or seven days thereafter within which to pay premiums. We think the evidence was competent and ample to show that appellant had elected

to waive the forfeiture provision of these policies before the death of the insured. Under the law appellant could not revoke such a waiver on learning of the death of the insured.

The policies provided that premium payments might be changed from annual to semiannual or quarterly installments at the premium rates applying when the policies were issued. Appellee contends that by agreement of the parties the premium payments were changed from annual to quarterly payments, and on May 18, 1931, the last day of grace, and the day before the insured died, the quarterly premiums, aggregating six hundred eighty-one dollars fifty-seven cents, were paid by Fred Cooke, one of the insured's sons and a member of the firm of Cooke Bros., by means of a check drawn by Cooke Bros. on the Grenada Bank in favor of appellant and delivered to appellant's agent, W. F. Davis, who gave appellant's receipt therefor. The evidence on behalf of appellee to establish that payment was as follows: It was made at Merigold in Bolivar county where Cooke Bros. had their store and where Fred Cooke resided; at the time of this payment, the insured was in Sunflower county at the home of his daughter, Mrs. Robertson, some thirty-five or forty miles from Merigold. (In this contention it should be stated that, when the Grenada Bank payment was made, the officers of that bank knew nothing of this payment.) W. F. Davis was subpoenaed as a witness on behalf of appellee, but did not testify, neither party offering him as a witness. It was shown by the evidence of Fred Cooke that Davis came to Cooke Bros.' place of business in Merigold on the last day of grace for the payment of the premiums on these policies, which, as stated, was the day before the death of the insured, and agreed with Fred Cooke that the premiums might be paid quarterly instead of annually, and thereupon Fred Cooke gave Davis a check on the Grenada Bank, payable to the appellant, for the aggregate of the quarterly

premiums, six hundred eighty-one dollars and fifty-seven cents, signing Cooke Bros.' name to the check. Davis thereupon delivered to Fred Cooke appellant's receipt for the payment, signed by himself. The evidence showed that Cooke Bros. at the time had funds in the Grenada Bank sufficient to cover the amount of the check.

Williams and Hardee, two witnesses on behalf of appellee, testified that shortly after the 18th of May, 1931, Davis showed them this check. They identified it on the witness stand. Davis' contract of agency with appellant authorized him to collect only first premiums, and the agency contract, as well as the policies, provided that premiums could be paid only to an authorized agent of appellant in exchange for its receipts signed by its president or secretary and countersigned by the agent. Appellant contends that under the agency contract with Davis, and under the policies, payment of the quarterly premiums to Davis was not a payment to appellant, because of Davis' lack of authority to receive payment and execute appellant's receipt. Appellee contends that those provisions in the policies, and in the agency contract of Davis, were waived by appellant.

The evidence relied on to establish such waiver was substantially as follows: W. F. Davis was appellant's agent who solicited and procured the insurance. He was a stockholder and a director in appellant company; for his services he was allowed the larger part of first premiums; his interest in the second premiums was seven and one-half per cent. Appellant often wrote Davis giving him a list of premiums falling due in a particular month. In such letters Davis was urged to see that the insured renewed their premiums. Appellant was active in preventing forfeiture of policies. Davis was often urged (quoting from one of appellant's letters to him) to "get behind these policies right away and make an effort to revive them."

I. E. Boyett, J. W. Cooke, Jr., and Davis, some time

after the death of the insured, went to Vicksburg and had an interview with Mr. Hennessy, the president of appellant company, with reference to Davis' authority to collect renewal premiums. Boyett and J. W. Cooke, Jr., both testified that Hennessy admitted that Davis had full authority to collect renewal premiums by taking checks therefor payable to appellant and giving receipts for the same. J. L. Smith testified that, subsequent to the death of the insured, Davis collected renewal premiums on policies held by him in appellant company and gave receipts therefor.

Appellant objected to the foregoing evidence upon the ground that it was irrelevant and incompetent for the purpose of establishing Davis' authority to accept the Fred Cooke payment. Appellant's contention is that the evidence neither established, nor tended to establish, that appellant waived the provision in Davis' agency contract and in the policies to the effect that he was without authority to collect renewal premiums; and the appellant sought by instruction, which the court refused, to have this evidence excluded from the consideration of the jury. The admission of the testimony and the refusal of the instruction are assigned and argued as error. We are of the opinion that the court committed no error in the admission of the evidence and the refusal of the instruction. If Davis had authority to collect the Fred Cooke check, his failure to give appellant's official receipt had no effect on such authority. Kansas City Life Ins. Co. v. Elmore (Tex. Civ. App.), 226 S. W. 709, 713. In that case the court used this language: "Of course, the stipulation for a certain kind of receipt would not necessarily make any kind of receipt or proof of payment inadmissible. It is a provision that could be waived if the evidence establishes the agent was in fact authorized to collect the premium." It is true, of course, that the facts, of themselves, that Davis was a stockholder and a director in appellant company gave him no authority

to collect renewal premiums and receipt therefor; nevertheless, those facts have a bearing on whether or not he had been actually authorized to do so.

Appellant urges with especial force that the court erred in admitting the evidence that some time after the insured's death Davis collected J. L. Smith's renewal premiums and gave receipts therefor with the approval of appellant. Although such evidence of subsequent transactions ordinarily has not much probative value, still we think in this case it had some value, and there was no error in admitting it. Where the authority of an agent to transact a particular kind of business is in issue, evidence of other and similar transactions by the agent for his principal is admissible. Smith v. McDole (Mo. App.), 269 S. W. 629, 630, and Domasek v. Kluck, 113 Wis. 336, 89 N. W. 139. In the latter case the court used this language: ''While this transaction, occurring a few days after plaintiff's [transaction], could have no effect in misleading plaintiff to believe in an agency which did not exist, it was some evidence of admission by the defendant that the agency in fact existed,'' there being no change in the relations between the principal and agent in the meantime.

Appellant argues that the evidence of the Fred Cooke payment of the premiums on these policies was so unreasonable as not to be believable. To maintain that position, appellant emphasizes one fact about which there is no dispute, and that is that Davis said nothing to appellant about this payment until some time in August, 1931, about three months after the death of the insured. It is true that that fact makes all the evidence tending to establish the Fred Cooke payment look suspicious. Still there are further facts in reference to the matter which have not yet been mentioned, and which we think have a material bearing on the issue. It was undisputed in the evidence that Davis was in appellant's office in Vicksburg not later than the second or third day after

the death of the insured, and stated that the insured was dead, and that he had attended his funeral. The evidence tended to show that that was the first information appellant had of the insured's death. The evidence was also undisputed that at that time the Grenada Bank had paid the premiums on these policies, and tended to show that Davis was informed of such payment. As stated, Davis did not testify in the case. His commission on the amount representing the difference between the quarterly premiums and the annual premiums was considerable. In other words, it was plainly to his interest that the Grenada Bank payment stand. It is not an unreasonable inference that for that reason Davis said nothing to appellant about having the check of Cooke Bros. for the quarterly premiums then in his possession. We think the evidence to establish this payment made an issue for the consideration of the jury. We cannot say that it is so unreasonable the court should have excluded it from the jury.

Appellee sought to establish still another payment of these premiums made by the deceased himself. The evidence with reference to this payment was substantially as follows: On May 21, 1931, the third day after the death of the insured, appellant received a letter from him dated May 16th, which was Saturday before his death. This letter was signed in the handwriting of the insured; that was without dispute in the evidence. In substance, he stated in the letter that he was inclosing appellant the check of Cooke Bros. for two thousand six hundred twenty-one dollars and seventy-five cents, the aggregate of the annual premiums on his two policies, setting out the numbers of the policies. This check was drawn on the Grenada Bank and was signed Cooke Bros. by J. W. Cooke, Sr., and filled out and' signed in the handwriting of the insured. The evidence showed that there were funds in the Grenada Bank to meet this check, and that the insured was authorized to draw checks in

the name of Cooke Bros. against such funds. Mr Hennessy, the president of appellant company, handled this letter and check. He testified that, when he received it, he did not know of the death of the insured, and that the reason he did not cash it was because the premiums on the policies had already been paid by the Grenada Bank. Neither of the insured's sons knew that this letter and check had been forwarded to appellant by their father until a day or two after his death, nor did the Grenada Bank know of it until after the insured's death. On Saturday, the 16th of May, the date of the letter, the insured and his wife were at the home of their daughter, Mrs. Robertson, near Holly Ridge in Sunflower county. The evidence showed that on that night he stated to the family that he had some letters to write and proceeded to write one or more; that on the next day, Sunday, he had his grandson, the little Robertson boy, about ten years of age, go with him to Leland to mail the letter or letters he had written; the boy testified that the post office was closed, and they waited for the south-bound train to Vicksburg, and his grandfather mailed the letter or letters on the railway post office when the train came. The members of the family pres ent testified that they did not know what letter or letters he had written, and the grandson testified that he did not know to whom the letter or letters mailed on the train were addressed. This train was due at Vicksburg about four o'clock in the afternoon. The mailing took place on Sunday, the 17th of May, two days before the insured's death. The envelop in which the letter and check for the premiums was mailed was stamped by the railway postal clerk as follows: "Mem. & N. O. R. P. O. Tr. 23, May 20, 1931."

Hines, a witness for appellant, testified that he was the railway clerk on the Yazoo & Mississippi Valley train going south from Memphis to Vicksburg on May 20, 1931, and stamped this particular envelop. He testified that

he knew his stamp because of certain peculiarities—indistinctness.

A day or two after the death of the insured, his son, J. W. Cooke, Jr., found in the home of his sister, Mrs. Robertson, a carbon copy of this letter. As stated above, none of the family, nor the Grenada Bank, knew that such a letter had been written until then. The evidence showed that it was the custom of appellant to accept checks in payment of premiums.

Appellant objected to all the evidence with reference to this alleged payment of the premiums, and in addition sought to have the court exclude it from the consideration of the jury by an instruction to that effect, which instruction the court refused. The action of the court in admitting this evidence and refusing the instruction is assigned and argued as error. Appellant contends that under the law, when premiums are paid on life insurance policies by means of checks sent through the mail, the checks must be mailed in time to reach the insurer within the grace period provided for in the policies, and that, unless they are received by the insurer within that time, they do not constitute payment of the premiums, regardless of when they were mailed, unless the insurer elects to retain the checks and treat them as payment of the premiums. To sustain that position, appellant cites numerous authorities. That rule, however, does not apply where it is the practice and custom of the insurance company (as was appellant's) to accept checks sent by mail in payment of premiums. Where such is the practice and custom, the deposit of a check in the mail in time to reach the insurance company in due course will save a forfeiture, even though it does not, in fact, reach the company until afterwards. Mutual Reserve Fund Life Ass'n. v. Tuchfeld (C. C. A.), 159 F. 833, 839; Illinois Life Ins. Co. v. McKay, 6 Ga. App. 285, 64 S. E. 1131, 1133; Hartford Life, etc., Co. v. Eastman, 54 Neb. 90, 74 N. W. 394, 395; Hollowell v. Life Ins. Co. of Va.,

126 N. C. 398, 35 S. E. 616; Travelers' Ins. Co. v. Brown, 138 Ala. 526, 35 So. 463; Anno. to Kays v. Little (Kan.), 1 A. L. R. 675, 677.

In the Tuchfeld Case the court used this language: "It is well settled that, notwithstanding a policy of insurance provides that payment of the premium shall be made at the insurer's home office by a time certain, if, after its issuance, the insurer requests or authorizes or acquiesces in the sending of the premiums by mail a deposit thereof in the mail in time to reach that office by the time it is due will save a forfeiture even though it does not in fact reach there until afterwards." In the McKlay Case, the court used this language: "In view of the practice by this company of permitting its policy holders to transmit through the mail premiums to it in Chicago, if the insured had deposited the letter containing the check for the premium . . . in apt time to have reached its destination in Chicago before the expiration of May 21, 1907, it would have been a sufficient payment of the premium in compliance with the terms of the contract." In the Eastman Case the court said: "Having invited its patrons to use the mails in making payment of their premiums, it is but reasonable and just to infer that the company intended to accept, as payment, funds sent by mail in time to reach it, in due course, on or before the day such premiums would become due."

We think the principle laid down in these cases is sound, and we are also of opinion that the evidence, although largely circumstantial, indicating that the letter inclosing check was mailed to appellant on the 17th day of May, two days before the death of the insured, was sufficient to go to the jury. As above stated, the check for the premiums was in the handwriting of the insured, the letter was signed in his own handwriting, they were both dated May 16th, and on the next day, the 17th, the insured mailed a letter or letters at Leland on the southbound Yazoo & Mississippi Valley train going to Vicks-

burg, which was due at Vicksburg at 4:15 that afternoon. All the members of the family testified that they knew nothing of the letter until after the death of the insured, and that none of them mailed it between that time and its receipt by appellant at Vicksburg. Appellant died on the 19th of May, and of course could not have mailed it on the 20th, the date stamped by the railway mail clerk on the envelop. It is not an unreasonable inference to draw from these facts and circumstances, on the contrary, it is a most reasonable one, that this letter, and the check, was mailed on the 17th, in time to reach Vicksburg that afternoon at 4:15, and that the letter was misplaced or covered up in the railway post office car in some way, and not discovered by the mail clerk until the 20th of May, when it was stamped.

Appellant contends that upon another ground the evidence of this payment should have been excluded from the jury. The Grenada Bank payment and the Fred Cooke payment were both pleaded specially. This payment was not. The declaration, however averred that the insured had performed all the conditions precedent to liability on the part of appellant. Appellant's contention is that, not having been specially pleaded, the evidence of this payment should have been excluded from the jury. The evidence bearing on the question developed in this manner: Appellant introduced the letter and check in evidence, and the letter from appellant returning the check to Cooke Bros., after the death of the insured. This was done by appellant on cross-examination of appellee's first witness. Appellee then, on redirect examination of the witness, brought out additional facts with reference to the payment. This was done without objection on the part of appellant. Appellant then showed by its president, Mr. Hennessy, the fact that the letter and the check were received by it on Thursday, May 21st, after the death of the insured on Tuesday night, May 19th; and then, through the railway mail

clerk, Hines, showed that he stamped the envelop containing the letter and check on May 20, 1931. Appellee later introduced as a witness the insured's little grandson, Billy Robertson, whose testimony has already been stated. So it appears that appellant is as much responsible for the development of the evidence bearing on this payment as was appellee, and that it went in without objection on the part of appellant in so far as its substance was concerned. Certainly there was no ground for surprise on the part of appellant when appellee contended that it was a question for the jury whether or not the insured paid the premiums before his death. A variance between the cause of action stated in the pleadings and that sought to be proved can only be taken advantage of by making objection to the testimony; without such objection the variance will not be considered on the appeal. It appears that section 568, Code of 1930, is a complete answer to appellant's position in this respect. That statute is in this language:

"A variance between the allegation in a pleading and the proof shall not be deemed material, unless it shall have actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits; and where it shall not be shown to the satisfaction of the court that the party has been so misled, and immediate amendment of the pleading may be made without costs, and without delaying the cause. If the party has been so actually misled, an amendment may be allowed on such terms as shall be just." Kimbrough v. Ragsdale, 69 Miss. 674, 13 So. 830, and True-Hixon Lbr. Co. v. McDonough, 154 Miss. 720, 123 So. 855.

Appellant requested, and the court refused, an instruction to the effect that, if the jury believed from the greater weight of the evidence that W. F. Davis had no right or authority vested in him by appellant to accept the check from Fred Cooke for the quarterly premiums, then they should return a verdict for appellant. There

was no error in refusing this instruction, because, if given, it would have entirely excluded from the consideration of the jury the payment made by the Grenada Bank, and the payment made by the insured before his death.

Over appellant's objection, the witness Hardee testified that on the next day after the death of the insured he saw, in the hands of W. F. Davis, the check of Cooke Bros., given by Fred Cooke for the quarterly premiums. The witness then went further and testified with reference to a conversation he had with Davis. The conversation had no material bearing on the question of the Fred Cooke payment of the premiums. That part of the testimony of the witness to the effect that Davis showed him a check which the witness identified while testifying was properly admitted. It had a direct bearing on the issue.

Over appellant's objection, the court admitted in evidence a letter from appellant's president, dated May 8, 1931, to W. F. Davis, stating: ''The thirty days grace period will expire on the above policies in a few days (referring to the policies here involved), won't you get behind this renewal.'' We think this letter had a bearing, although small, on the question of Davis' authority to collect renewal premiums. It was a circumstance to be considered with all the other evidence in the case bearing on that point.

Appellant argues that the court erred in permitting Adams, the cashier of the Grenada Bank, over appellant's objection, to testify as to what took place between him and the officials of the Merchants' National Bank & Trust Company at Vicksburg in reference to his efforts to make payment of the premiums due on the Cooke policies, and in permitting the introduction in evidence of the premium receipts received by the Grenada Bank through the Merchants' National Bank & Trust Company of Vicksburg. What has been said with reference

to the Grenada Bank payment, we think, disposes of this question. The objection to this evidence was upon the ground that the "alleged payment was made subsequent to the death of the insured and without knowledge on the part of the insurer as to the death of the insured."

Appellant assigns and argues as error the refusal by the court of the following instruction: "The court instructs the jury that the burden of proof in this case is upon the plaintiff to show by the greater weight of all the credible evidence in the case that the premiums due on April 18, 1931, and payable within thirty days thereafter, were in fact paid on or before the 18th day of May, 1931, and that unless she has done so it is your sworn duty to find for the defendant." There was no error in refusing this instruction, because it eliminated entirely from the consideration of the jury the Grenada Bank payment, which was made on the 20th day of May, 1931.

We do not think the other questions argued by appellant are of sufficient merit to call for a discussion by the court.

Affirmed.