191 So.2d 115 (1966)
SOUTHWEST GAS PRODUCING COMPANY, Inc., et al.
v.
A.D. SEALE et al.
No. 43932.
Supreme Court of Mississippi.
October 24, 1966.
Thomas R. Crews, Thompson, Alexander & Crews, Kenneth I. Franks, Jackson, H.B. Mayes McGehee, Meadville, for appellants.
Louis Alford, McComb, B.D. Statham, Magnolia, Louis G. Baine, Jr., Baton Rouge, La., for appellees.
JONES, Justice.
Appellees, owing the minerals or royalty interests, and one of them, A.D. Seale, also being the owner of the surface with the right to execute leases for the drilling *116 and mining of certain lands in Franklin County, Mississippi, sued Southwest Gas Producing Company, Inc. (called Southwest), Charles F. Hayes & Associates, Inc., and other interested parties not necessary to mention, in the Chancery Court of Franklin County, seeking cancellation of an oil, gas and mineral lease executed March 2, 1961, by A.D. Seale to Southwest, and also cancellation of all interests having the said lease as their source.

I.
The lease covered an estimated 615 acres situated in several sections of Franklin County. In April 1964, Southwest assigned the lease to Charles F. Hayes & Associates, Inc., insofar as it covered lands in Sections 36 and 39, Township 7 North, Range 2 East, reserving an overriding royalty of 1/8th of 8/8ths of the oil produced. The plat hereto attached shows the lands covered by
 *117 the assignment (outlined in dark or heavy lines), together with adjacent land and various pooled units. Leases on the other lands shown on said plat were acquired by Hayes either by assignment or directly. The pooling clause in the Seale lease provided:
"Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in lessee's judgment it is necessary or advisable to do so in order properly to develop lawful spacing rules which may be prescribed for the field in which this lease is situated by any duly authorized authority, or when to do so would, in the judgment of the lessee, promote the conservation of the oil and gas in and under and that may be produced from said premises. Lessee shall execute in writing an instrument identifying and describing the pooled acreage."
The bill of complaint alleged that the defendant operators fraudulently, in bad faith, and in violation of the duty owed by a lessee to its lessor, had gerrymandered and so constituted its drilling units as to defraud appellants in the recovery of oil belonging to them. Seale also sought surface damages to his land, assertedly done when the wells designated on the exhibit as Seale No. 2 and Seale No. 3 were drilled. Such damages were sought not for alleged excessive use of land, but because it was claimed the lease had been terminated by acts of the lessee and by letter of appellant prior to the drilling of said wells.
The chancellor held for appellees. He cancelled the lease and interests derived therefrom insofar as that part of it assigned to Hayes was concerned, and also gave Seale a judgment for $1,000 for surface damages, allowed an appeal and provided on remand for an adjustment of equities. From this decree, appellants appeal to this Court.
We reverse the case, enter judgment here, and remand. Appellees were entitled to relief but not that allowed by the lower court.
There is no cross-appeal from the court's failure to cancel that part of the lease not assigned to Hayes. This appeal pertains to that portion of the lease which was cancelled, and the actions of Hayes relative thereto.
Delay rentals under Seale's lease were payable to him. He accepted them for the years 1962, 1963 and 1964, the rentals for 1964 having been paid on or before their due date of March 2, 1964. It is therefore unnecessary to discuss the events preceding March 2, 1964.
At the time of the assignment by Southwest to Hayes, there were outstanding a number of royalty deeds by Seale of practically the same form and confusing nature as those described in Payne v. Campbell, 250 Miss. 227, 164 So.2d 780 (1964). The deeds were term instruments which provided if oil, etc., were not produced in paying quantities on or before January 26, 1966, reversion to Seale would occur. The total interest conveyed, if the proportion was "of the whole" as stated in the deeds, would have amounted to more than fifty percent of the oil produced.
The farmout agreement from Southwest to Hayes contained a provision that Hayes would not drill on Seale land nor include any portion of it in a pooled unit before January 26, 1966, without written consent from Southwest.
Prior to assignment from Southwest, Hayes obtained a lease from John Chambers on 113 acres in Section 39, adjacent to Seale. This lease had a drilling obligation and provided for a one-fourth royalty. Chambers would not execute a lease which permitted his lands to be pooled with Seale's land. A side-letter so providing was given Chambers by Hayes. Southwest's lease from Seale provided for a one-eighth royalty, and their assignment reserved an overriding one-eighth royalty.
Bryan Johnson owned lands adjacent to Seale, but he would not sign a lease containing *118 any pooling provision. He executed to Hayes a one-year lease, containing a drilling obligation and providing for a one-fourth royalty.
The assignment from Southwest also included leases executed by the Hannons who owned land in Section 39. On the lease and assignment, production was also subject to a one-fourth royalty, including Southwest's override.
Apparently Hayes' interest in oil recovered was the same in the entire block. Having secured leases covering the block, Hayes soon began development. On May 27, 1964, having secured the necessary permit from the Oil and Gas Board, he spudded the Hannon No. 1 well, the drilling unit being the NW 1/4 of the NW 1/4 of Section 39. The site was 330 feet north of the south line and 330 feet west of the east line of the unit. This well was completed as a producer on June 7, 1964, and was the discovery well in what became known as the Morgan Creek Field.
The next well was Johnson No. 1, located 1330 feet north of Hannon No. 1 in the SW 1/4 of Section 36. This well was spudded July 20, 1964, and completed as a dry hole on July 26, 1964.
Chambers No. 1, located a little south of east of Hannon No. 1 and situated in the NE 1/4 of Section 39, was spudded August 21, 1964, and completed as a producer on September 3, 1964.
Chambers No. 2, slightly west of south of Chambers No. 1 and in the SE 1/4 of the NW 1/4 of Section 39, was spudded September 4, 1964, and completed September 23, 1964, as a producer.
Hannon No. 2, a little west of south of Hannon No. 1 and in SW 1/4 of NW 1/4 of Section 39 was spudded September 15, 1964, and completed as a producer September 29, 1964.
No part of Seale's land was pooled in any of the drilling units above mentioned. The production of all producers was from the Lehman Sand of the Wilcox formation.
In the summer of 1964, the decision in Payne v. Campbell, supra, became known, and it was considered as settling the amount of oil payable under the royalty deeds on the Seale tract aforesaid.
On August 3, 1964, Seale's attorney demanded development of Seale's land "within" the time provided in the lease, thus recognizing the lease as in force. On September 3, 1964, he again wrote and demanded development through drilling. Within 58 days from the August 3 demand for development, Hayes had spudded in Seale No. 1 (October 1, 1964), and it was completed as a producer on October 12, 1964.
Seale complains, however, that in the Seale No. 1 unit was included a large part of Bryan Johnson's land, where a dry hole had been drilled, and a part of the Chambers' land not included in Chambers No. 1 unit. Seale No. 1 included 6.35 acres of Chambers' land, 13.36 acres of Seale's land, and 20.29 acres of Johnson's land.
At Hayes' request and on his promise to include his land in the Seale No. 1 unit, Johnson executed a new lease with pooling provisions after the drilling of the dry hole.
Seale No. 1 was located about the center of the NE 1/4 of the NW 1/4 of Section 39. Seale No. 2, northeast of Seale No. 1 in the same NE 1/4 of the NW 1/4, was spudded on October 14, 1964, and completed as a dry hole on October 19, 1964. This unit also included Johnson land. Seale No. 3, located in the same NE 1/4 of the NW 1/4 near the east boundary and southeast of Seale No. 1, was spudded on October 27, 1964, and completed as a dry hole November 1, 1964.
Complaint was made that Seale No. 1 was perforated lower than Chambers No. 1, these being the best two wells in the field. The lower perforation of Seale No. 1 was because of engineering difficulties, as explained by a petroleum engineer. The proof showed that the southwest wells in *119 the field (Hannon Nos. 1 and 2 and Chambers No. 2) had from nine to twelve feet of sand. Chambers No. 1 and Seale No. 1 each had twenty-three feet of sand. After drilling Chambers No. 1 and No. 2, it was thought that the field would run in a northeasterly direction.
It will be noticed that the drilling units are not comprised of square units, such as quarter-quarter sections. However, all drilling permits were approved by the State Oil and Gas Board and are in accord with rules of the Board. After the discovery well, it was known that the sand involved was the Wilcox formation.
The proof showed that reservoirs in such formation were customarily small; that it was the general practice of operators, recognized as prudent action, to locate as many wells as reasonably possible close in and on the reservoir, so that as much oil as possible might be obtained for all interested parties. The desire to have as many wells on or near the "high" of the reservoir prompted the requests for irregular units. It is seen from the exhibit hereto that by so doing four wells were drilled in the NE 1/4 of the NW 1/4, two being dry. If the three wells drilled on his property had all produced, Seale would have had more production than any other landowner.
Hayes actually drilled eight wells  five producers and three dry holes. As far as he was concerned, the proportion of oil which he would receive was the same under each well or lease. The experts both for appellants and appellees testified that the field was rapidly and prudently developed.
The chancellor was of the opinion that Hayes violated his duty to Seale by not pooling a portion of Seale's property in the Johnson No. 1 unit, or the Chambers No. 1 unit. We do not think that Hayes was under a duty to include and pool Seale property in these units. There is no requirement of this nature in the pooling clause of the lease, or the conservation laws, or the implied covenants of the lessee.
However, the chancellor was justified in holding that the inclusion of 20.29 acres of Johnson land (a portion of which had previously proven dry) with Seale's land in Seale Unit No. 1 violated his duty to Seale of fair dealing and good faith in the formation of that unit.
The chancellor held that Seale was entitled to $1,000 surface damages resulting from the drilling of Seale No. 2 and Seale No. 3, but the decree seems to have reserved all question of damages and the adjustment of equities until a remand. For reasons later defined, we conclude that the lease should not be cancelled, and that Seale was not entitled to surface damages (no proof being made that there was excessive use for drilling).

II.
When a lessee is bound by implied obligations relating to operations on a leasehold, the first question is the standard of conduct to which the operator is to be held. There are three views: (1) The duties are absolute; (2) they are governed by a test of good faith; and (3) they are governed by the "prudent operator" standard. 5 Williams & Myers, Oil and Gas Law, § 806, at 28 (1964).
The great majority of jurisdictions, including Mississippi, apply the "prudent operator" standard. Monsanto Chem. Co. v. Andrae, 245 Miss. 11, 147 So.2d 116 (1962); Monsanto Chem. Co. v. Sykes, 245 Miss. 207, 147 So.2d 290, 149 So.2d 20 (1962); 5 Williams & Myers, Oil and Gas Law, § 806.3, at 35 (1964).
The last cited section of Williams and Myers, discussing the prudent operator test, quotes from Brewster v. Lanyon Zinc Co., 140 F. 801 (8th Cir.1905), and italicizes the following:
"Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the *120 interests of both lessor and lessee, is what is required. * * *"
Then the authors say:
"The italicized sentence in the preceding quotation epitomizes the rule that has been approved by a great majority of the states having decisions on the point."
What duty does the lessee owe the lessor where the lease contains a pooling clause?
4 Williams, Oil and Gas Law, section 670.2, at 83-84 (1964), has this to say:
"In a number of contexts the economic interests of one person in oil and gas properties may be affected by the conduct of another person. In situations of this character the self interest of both parties will frequently coincide, in which event self interest of one will adequately protect the other against improper conduct. But when this is not true, what protection is there against improper conduct? * * * when a lease contains a clause authorizing the lessee to pool Blackacre with other parcels, the interest of the lessor may be affected by the conduct of the lessee in including only a portion of Blackacre within a unit or in including within the unit other lands in which the lessee has an interest.
"It is not within the scope of this discussion to indicate all of the relationships in which this problem may arise but it may be suggested that there appears to be developing in each a duty which may be described as a `duty of fair dealing.' The character and scope of the duty remains ill defined at present, and it may not be the same in every context."
Hoffman, Voluntary Pooling and Unitization, at 106-107 (1954), states:
"As an abstract proposition there can hardly be issue taken with the rule that under the lease pooling clause the lessee is bound to act in good faith and that the requirement of good faith will forbid the pooling of proven unproductive acreage."
Myers, The Law of Pooling and Unitization, section 3.02 at 55 (1957), announces the same rule:
"In the exercise of the power given in the pooling clause the lessee must exercise good faith. This means, among other things, that lessor's productive acreage cannot be pooled with non-productive acreage of others to the disadvantage of lessor. Lessee cannot `promote or acquire antagonistic interests' and, where one is given the power to lease, there must be the utmost fair dealing on the part of the grantee."
Imes v. Globe Oil & Refining Co., 184 Okl. 79, 84 P.2d 1106 (1938), is analogous. The owners of twenty-one lots in Oklahoma City executed a community lease which provided:
"It being understood and agreed that any lot, lots or parcels of land embraced within the outer boundary lines of the above-described block or blocks and addition to Oklahoma City, may at any time be included within the terms hereof and become a part of the leased premises covered hereby * * *." 184 Okl. at 79, 84 P.2d at 1107.
The lease also stated:
"It is further agreed that lessee may at any time without the consent of lessors, consolidate, jointly operate, and develop this lease and the land covered hereby with any other lease or leases covering any lot, lots or parcels of land embraced within the outer boundary lines of the J.W. Craig's Sub. of Block 19, Fruitland Addition to Oklahoma City, Oklahoma * * *." 184 Okl. at 79-80, 84 P.2d at 1107.
Two wells were developed on these twenty-one lots in 1932 and 1933. In 1934 the owners of six other lots executed leases thereon, and it was sought to bring these lots under the original lease and give their owners a pro rata share of royalty from the *121 previously drilled wells. In this situation the Supreme Court of Oklahoma said:
"* * * Twenty-one lots were bound together. Two wells were drilled. Months thereafter, 6 more lots were sought to be added. The situation had become static insofar as the 21 lots were concerned, and their relation to each other and to lessee had been firmly established upon terms not to be disturbed for reasons less potent than those existing which induced them to venture.
"There was much evidence given on the issue of whether these six lots had not been condemned as valueless for oil and gas purposes. The evidence sustains the finding that they were valueless. This being so it cannot be said that the owners of the 21 lots agreed that `at any time' meant a time in the future, after they had ventured and won, others might thereafter, when they had independently ventured and lost, attach themselves and share. It is no refutation of this to say that the result would have been the same had the owners of the six lots joined early. They did not join then. At the time the lease was signed the groups of owners were venturing alike without previous knowledge. * * *
"As pointed out above, the lessee was virtually the agent of the lessors, and for this reason he was bound to use good faith. To an extent their interests were mutual. After production, they parted somewhat. In this case, the lessors had everything to lose and nothing to gain, whereas lessee stood to gain 6/27ths of the 1/8 production, which came from lessors. It is not reasonable for him to argue that lessors were willing for him to acquire adjoining lots thereafter and progressively increase his share and to the same extent decrease theirs. The cases cited holding that he could not promote or acquire antagonistic interests are applicable. Probst v. Hughes, 143 Okl. 11, 286 P. 875, 69 A.L.R. 929." 184 Okl. at 81-82, 84 P.2d at 1109.
In Gillham v. Jenkins, 206 Okl. 440, 244 P.2d 291 (1952), the Oklahoma Court discussed the Imes case further, although pooling was held to be in good faith in Gillham. See also McDonald v. Grande Corporation, La. App., 148 So.2d 441 (1962).
It appears in these cases, where pooling was condemned, that the lessee obtained an advantage over the lessor by his actions. In the instant case, it is argued that the lessee had no advantage to gain by including the non-productive land of Johnson in Seale Unit No. 1. However, Johnson's first lease prevented pooling. Hayes, in order to obtain a new lease from Johnson, promised him that he would pool the land with Seale and drill another well. On this understanding, Johnson's new lease was given. It is true the evidence shows Hayes would obtain the same percentage of oil from the Hayes and the Seale lease. However, by obtaining the new lease from Johnson and pooling his land with Seale, Hayes was protecting his block from the drilling of any "fringe" wells in Johnson's area, and this was at the expense of the pooled lands in Section 39.
Moreover, the inclusion of 20.29 acres of the Johnson land in Seale Unit No. 1, although Hayes knew that a considerable portion of the Johnson land was dry, (Johnson No. 1, recently drilled, had demonstrated that), was not in accord with the standards of a reasonably prudent operator having in mind the interests of both lessor and lessee. We do not seek here to define the nature of the restrictions on the lessee's authority under a pooling clause, but we hold that under the stated circumstances, the lessee, Hayes, did not comply with the implied requirement in the lease that he act fairly and in good faith toward his lessor, Seale. Hayes' actions in this particular pooled unit (Seale No. 1) are not such as could be reasonably expected of an operator having regard for both his and his lessor's interest. They do not comport with the duty of good faith and fair dealing under the pooling clause in the Seale lease and under the implied requirements *122 of the lease. See 4 Williams, Oil and Gas Law, § 670.2, at 83-92 (1964).

III.
The next question is what relief in equity and good conscience should be given? The lessor developed a small field with five producing wells and three dry holes. One producer was on appellee's land. Two other wells were drilled at Hayes' expense on Seale land, but, unfortunately, were dry.
Various courts have recognized three separate remedies for breach of the covenant of reasonable development: (1) Outright concellation, except for a small area surrounding existing, producing wells; (2) the more moderate conditional decree of cancellation, unless a specified number of wells are drilled within a fixed period of time; and (3) damages. We think that damages are the appropriate remedy in the instant case. This is the view taken by the Texas Courts. Christe, Mitchell & Mitchell Co. v. Howell, 359 S.W.2d 658 (Tex. Civ.App. 1962); 5 Williams & Myers, Oil and Gas Law, § 834, at 240-241 (1964). The Texas rule is in accord with what we think is the better authority, unless the remedy of damages is wholly inadequate, and that does not appear here. Further, it is consistent with the traditional decisions of this Court not favoring forfeitures. Denkmann Lumber Co. v. Morgan, 219 Miss. 692, 69 So.2d 802 (1954); Oliver v. Board of Supervisors, 211 Miss. 447, 51 So.2d 766 (1951); City of Jackson v. Alabama & V. Ry. Co., 172 Miss. 528, 160 So. 602 (1935); Stonewall Life Ins. Co. v. Cooke, 165 Miss. 619, 144 So. 217 (1932); National Life Ins. Co. v. Sparrow, 151 Miss. 387, 118 So. 195 (1928). Equity abhors a forfeiture and is disposed to seize on slight circumstances to avoid one. Monsanto Co. v. Cochran, 254 Miss. 399, 180 So.2d 624 (1965).
Accordingly, the decree of the chancery court is reversed. We hold that Seale is entitled to recover from Hayes damages for the breach of the lessee's implied covenant of good faith and fair dealing in the formation of Seale Unit No. 1. This cause is remanded to the chancery court for the appropriate determination of damages.
Seale No. 1 included 6.35 acres of Chambers' land; 13.36 acres of Seale's land; and 20.29 acres of Johnson's land. The issue centers on the inclusion in Seale No. 1 of 20.29 acres of the Johnson tract. The record reflects without dispute that at least some of this 20.29 acres of Johnson would not have been included in Seale No. 1 by a reasonably prudent operator exercising the duty of fair dealing and good faith with his lessor, Seale. Johnson well No. 1 proved to be a dry hole. On the other hand, the testimony and the isopach maps indicate that perhaps under all of the circumstances, including the size and shape of the field, some of the Johnson land may have been justifiably placed in Seale No. 1.
On remand, the chancery court should determine how much, if any, of the Johnson tract could have been included in Seale No. 1 by a reasonably prudent operator acting in the interests of both lessor and lessee, and in accord with the duty of good faith and fair dealing. This should be determined in the light of the facts and circumstances known at the time of the creation of Seale Unit No. 1, and of the fact that the lessee under the pooling clause of a lease has a reasonable area of discretion in determining the configuration of a pooled unit.
Assuming but not deciding that a given number of acres of Johnson land could reasonably have been included within Seale Unit No. 1, to the aggregate of that figure and 6.35 acres of Chambers' land, should be added sufficient acreage of Seale land in Section 39 to constitute a 40-acre drilling unit. This would necessarily result in awarding to Seale additional acreage in the unit, and thus additional percentage participation in the royalty from the unit.
The royalty provided by Seale's lease will be computed on all such production heretofore had from the well on Seale No. 1, on the basis of Seale's and his grantees' additional and increased participation in unit *123 production. There shall be credited against this the royalty heretofore paid Seale and his grantees, if any. Royalty on future production shall be computed on the same formula, after determination thereof by the chancery court, and shall be paid in the same manner. For example, and solely by way of illustration, if the trial court should determine that 10.65 acres of Johnson land could properly have been placed in Seale Unit No. 1, then the aggregate of that and Chambers' acreage of 6.35 acres would be 17 acres. Seale's and his grantees' participation in the unit would thus be the difference between that figure and 40 acres, or 23 acres.
In summary, the decree of the chancery court is reversed, and judgment is rendered here denying cancellation of the lease and surface damages, and the cause is remanded for the determination of appellees' damages in accordance with the above formula.
Reversed, judgment rendered here, and remanded for determination of damages only.
ETHRIDGE, C.J., and PATTERSON, INZER and ROBERTSON, JJ., concur.