397 So.2d 538 (1981)
CONTINENTAL OIL COMPANY, known as Conoco, Inc.
v.
Warren L. Blair, James R. Blair, and Joe T. Blair.
No. 52285.
Supreme Court of Mississippi.
April 29, 1981.
Leslie H. Southwick, John M. Grower, Brunini, Grantham, Grower & Hewes, Jackson, for appellant.
Martha W. Gerald, Walker L. Watters, William F. Blair, Gerald, Brand, Watters, Cox & Hemleben, Jackson, for appellees.
Before ROBERTSON, P.J., and BROOM and BOWLING, JJ.
ROBERTSON, Presiding Justice, for the Court:
Continental Oil Company (Conoco) appeals from a decree of the Chancery Court of Clarke County ordering it to pay Warren *539 L. Blair, James R. Blair, and Joe T. Blair $92,759.07 for damages sustained by them because of drainage of oil from a 38-acre drilling unit (Tract 31-11) in the Davis Field in Clarke County, in which they own three royalty acres. The chancellor found that the drainage was to wells on an adjoining 40 acre drilling unit (Tract 31-10), both drilling units being parts of the same original lease to Conoco.
On May 15, 1962, S.B. Kirkland executed an oil, gas and mineral lease to Marion Buchanan covering 437 acres in Section 31, Township 3 North, Range 16 East, in Clarke County. Three days later, on May 18, 1962, Buchanan assigned this lease to Conoco.
The State Oil and Gas Board approved 40-acre drilling units for the Kirkland lease. The drilling units which are of primary concern in the case at bar are: Drilling unit 31-11, which covers 38 acres in the NE 1/4 of the SW 1/4 of Section 31, and 40-acre drilling unit 31-10 (the NW 1/4 of the SE 1/4 of Section 31).
After the discovery well was brought in on Unit 31-10, but before any wells were drilled on Unit 31-11, on August 21, 1969, James Blair, Joe Blair and Warren Blair purchased 3 royalty acres in 38-acre drilling unit 31-11 from S.B. Kirkland's heirs. Subsequently Conoco drilled and dually-completed 4 oil wells on Unit 31-11 and 4 dually-completed wells on Unit 31-10. Each dually-completed well draws from 2 separate pools of oil, so these four wells on Unit 31-11 would be the equivalent of 8 separate wells, and on Unit 31-10 there would be the equivalent of 10 separate wells since the discovery well was also on Unit 31-10.
The Davis Field in Clarke County includes at least 23 separate oil pools or reservoirs. In their amended bill of complaint, the Blairs aver that 20 of these 23 separate pools underlie 38-acre drilling unit 31-11 in which they own 3 royalty acres, and that 9 of these pools are being drained by wells drilled by Conoco on adjacent property (largely 40-acre drilling Unit 31-10), both units being parts of the same Kirkland lease. The Blairs charged that Conoco had "failed and refused to act as a reasonably prudent oil and gas operator in failing to protect Complainants' land from said drainage."
Conoco answered:
"Defendant would show that the Kirkland Lease which covers the subject lands has been operated by the Defendant as a prudent operator and that the Complainants have not suffered any compensable net loss by drainage."
In his opinion in favor of complainants, the chancellor concluded:
"The defendant, Continental Oil Company, failed to act, or did not act, as a reasonably prudent operator during its operation of the Davis Field up until July 1, 1978.
.....
"The defendant's continued refusal and/or continued inaction to properly protect the individual units of the Davis Field, among which is the interests of the complainants, constitutes bad faith and abuse toward the complainants who have been severely damaged as a result thereof."
Conoco has assigned as error:
1. The lower court erred in finding that there exists an obligation to prevent "drainage" from one part of a lease to another well on the same lease.
2. The lower court erred in permitting a change in royalty ownership after the lease was entered to enlarge the obligations and diminish the rights of the lessee, in complete disregard of basic contract principles.
3. The lower court failed to consider the effect of express lease terms governing both parties, and thereby erred in permitting the conveyance of a royalty interest subsequent to the lease to increase the burdens upon the lessee.
4. The lower court erred in finding that Conoco had not conducted its development in good faith as a prudent operator.
5. The lower court erred in finding that any drainage had occurred to wells drilled off of the Kirkland lease.

*540 6. The lower court erred in establishing the measure of drainage as $12.17 per barrel of oil for each barrel allegedly drained.
There is a fundamental difference between the obligation of the lessee to protect the lessor from "external" drainage, that is, drainage to wells on adjoining lands under a different lease from "internal" drainage, which is drainage from one well to another within the same lease.
The rule is well stated in 2 Williams & Meyers, Oil and Gas Law, § 409.3 (1980):
"[U]nless negated by express provisions, leases contain an implied covenant to protect the leasehold from external drainage, that is, from drainage to non-leasehold lands." 2 Williams & Meyers at pp. 287-88.
The authors go on to say:
"To be distinguished from external drainage ... is internal drainage. This is drainage from one part of [the leased property] to another, all within the boundaries of the leasehold. The original lease contains no implied covenant against internal drainage." (Emphasis added). 2 Williams & Meyers at p. 289.
This Court referred to the covenant as one "to protect leased premises against drainage by [the operator's] oil well on adjoining land." Monsanto Chemical Company v. Sykes, 245 Miss. 207, 212, 147 So.2d 290, 291 (1962). (Emphasis added).
What then are the duties of the lessee in this situation? This Court has adopted the majority position that the obligations of a lessee are governed by the "prudent operator rule":
"In the oil business, and in determining the rights of people, there must be some guide by which to go. The guide developed through the decades is the prudent operator rule. It is essential as a standard, just as the conduct of a reasonably prudent man is essential in negligence cases." Monsanto Chemical Company v. Andreae, 245 Miss. 11, 19, 147 So.2d 116, 119 (1962). (Emphasis added).
Under the prudent operator rule, any claim that S.B. Kirkland or his successors could bring against the lessee, Conoco, would have to be expressed in terms of whether Conoco had violated an express or implied obligation owed to the lessor, judged under the prudent operator standard. Five implied obligations have been read into oil and gas leases, where express provisions have been omitted. See, e.g., 2 Summers, Oil & Gas § 395 at 535-6 (1959). These implied covenants, taken together with the express terms of the lease, form the obligations owed by Conoco to its lessor. The case at bar is based solely upon a supposed obligation by Conoco to compensate an owner of royalty interest in one part of the original lease from drainage by wells drilled on other parts of the same lease. Such an obligation did not expressly exist under the original lease. Therefore, the Blairs are arguing that when the heirs of Conoco's lessor conveyed a 3/38 royalty interest in one drilling unit out of eleven drilling units in the original lease (and that conveyance being 7 years after the original lease was entered into, and also after the discovery well had been brought in on an adjoining drilling unit of the same lease), it created a new implied obligation upon its lessee. Such a position is untenable not only under general contract law concepts, but also under the specific terms of the lease that governs the rights of the parties.
The May 15, 1962, lease from S.B. Kirkland of 437 acres in Clarke County, which incidentally has been continuously held by Conoco since 1962, contained these express provisions. Paragraph 9 provides:
"The estate of either party hereto may be assigned in whole or in part and the covenant hereof shall extend to the heirs, executors, administrators, successors, and assigns of the parties... . No change in or division of the ownership of the right to receive royalty, delay rentals, or other payments accruing to Lessor hereunder shall operate to increase or enlarge the obligations or to diminish the rights of Lessee hereunder with respect to the location or number of wells or any other obligation whether express or implied, *541 nor shall Lessee be required to separately measure or store or to separately account for royalties or other payments on account of production from any particular portion of the land herein leased. ..." (Emphasis added).
Paragraph 5 provides:
"As to that part of the leased premises which may be so included in a unitized area, the aforesaid royalties and payments on the allocated production shall be in lieu of any other royalties and payments which would otherwise become due Lessor under the terms hereof on account of any production from that part of the leased premises which may be so included in a unitized area. Lessee shall not be obligated to drill any offset well upon the leased premises to offset wells drilled upon any unitized area which includes any part of the leased premises." (Emphasis added).
On August 21, 1969, when James Blair, Joe Blair and Warren Blair purchased their three royalty acres in 38-acre drilling tract 31-11, they bought with constructive and conscious knowledge of the terms, provisions and covenants of the 1962 Kirkland lease. In Millette v. Phillips Petroleum Co., 209 Miss. 687, 48 So.2d 344 (1950), (a suit by the original lessor against the original lessee), this Court said, among other things:
"The subject of offset wells is expressly provided for in the lease and there are evidences in the lease itself that its contents were examined and substantial corrections made in the printed form. The parties were competent to contract with regard thereto, and there is no room for an interpretation of its unambiguous provisions, much less of its nullification by supposed contrary implications. The producing well closest to appellant's lands is 570 feet. The limitation of such duty on the part of the lessee to such wells as are within 150 feet precludes resort to an implied covenant in respect of a development by the drilling of an offset well on the lands of appellant." 209 Miss. at page 701, 48 So.2d at page 346. (Emphasis added).
R. Malone, Problems Created by Express Lease Clauses Affecting Implied Covenants, 2 Rocky Mt.L.Inst. 137-138 (1956), summarizes cases in the area of implied covenants in this way:
"[I]nasmuch as implied covenants are based upon a presumed intention of the parties, any provision of the lease which expresses an agreement of the parties upon the subject matter of an implied covenant may generally be considered as negativing the existence of, or the necessity for, such a covenant... . The great majority of the cases conclude that any expression by the parties upon the subject will negative the presumed intention which is the basis of all implied covenants."
Paragraphs 5 and 9 of the original Kirkland lease contain what has come to be known in the oil and gas law area as "entirety provisions". 2 Williams & Meyers, Oil and Gas Law, § 521.3 (1980), at page 678.15, has this to say about entirety provisions or clauses:
"Such clauses are inserted in leases primarily for the benefit of the lessee to make it clear to lessors or subsequent transferees of the lessor or lessors that inside property lines created by later divisions of the fee ownership or by royalty conveyances shall not affect the lessee's duties of development and operation." (Emphasis added).
In Krone v. Lacy, 168 Neb. 792, 97 N.W.2d 528 (1959), the Supreme Court of Nebraska said:
"The entireties clause is a valid burden imposed upon the interest in the property retained by the lessors.... The lessors, by executing the lease, placed a restriction upon their power to alienate any part of their estate in the land covered by the lease except in accordance with the provisions of the lease itself... ." 97 N.W.2d at 534.
Texas has also recognized the validity of an entireties clause. See Cockrell v. Texas Gulf Sulphur Company, 157 Tex. 10, 299 S.W.2d 672 (1956).
*542 Basic contract law also prohibits one party from unilaterally increasing the burdens of the other under the contract. This point is so clear that the authors in 2 Williams & Meyers, Oil and Gas Law, § 521.3 at 678.15-678.16 (1980), stated it parenthetically in this way:
"(It is clear, however, that even absent such [an entireties] clause, the duties of the lessee may not be increased by virtue of subsequent transfers by the lessor or lessors)."
In Felmont Oil Corp. v. Pan American Petroleum Corp., 334 S.W.2d 449 (Tex.Civ. App. 1960), the Texas Court concluded:
"On the date that the two basic leases were executed and delivered, the lessee ... owed to the lessor .. . only the obligations contained in the two leases, either expressly or by implication... . Since the lessor may not, himself, arbitrarily separate or subdivide the express or implied obligations imposed on the lessee by the terms of the lease, it follows that such lessor would not be permitted to accomplish this indirectly, by the sale of the minerals to numerous parties in segregated tracts and parcels, and thus subdivide what was theretofore a single unified obligation affecting the lease as a whole, into countless separate obligations, each of which would be subject to further fractionization or division in the event of further sales by the purchasers thereof." 334 S.W.2d at 453.
The Court of Appeals of Kentucky, in Martin v. Graf, 289 Ky. 272, 158 S.W.2d 637 (1942), reached the same conclusion when it held that:
"[A lessor] cannot by subdivision of lands under a lease into separate tracts place an additional burden on the lessee to develop the separate tracts as units or as separate leases."
158 S.W.2d at 639, 289 Ky. at 276.
The Blairs' witnesses admitted, under cross-examination, that the wells drilled by Conoco were geologically well located and would efficiently drain all of the recoverable oil from the pools under the 437 acres of the Kirkland lease. They also admitted that the only reason the contention could be made that more offset wells should be drilled is because the Blairs, 7 years after the original lease, had acquired separate royalty interests (3/38ths in one drilling unit of eleven in the 437-acre tract originally leased by S.B. Kirkland). Kirkland, if he had been alive, under his lease contract of May 15, 1962, with assignee Conoco, could not have contended that more offset wells should be drilled because such a contention would have been directly contra to the clear provisions of his lease contract with Conoco (Paragraphs 5 and 9).
As was said by the Texas Court of Civil Appeals in Felmont Oil Corporation, supra, the lessor cannot do indirectly what he has agreed not to do directly.
If Conoco had drilled no wells on the Blair tract (Unit 31-11) and had extensively drilled wells on adjoining property, under Phillips Petroleum Company v. Millette, 221 Miss. 1, 72 So.2d 176 (1954), there would be some merit to the argument that Conoco had violated an implied duty not to perform any acts that impaired the value of the lease.
In Millette, the lessor had received no production, no wells had been drilled on his land, and the lessee had refused to give up the lease or permit others to drill. Phillips had acted unfairly and inequitably, and the prudent operator standard is inextricably tied in with the principles of equity. It requires good faith dealing between the lessor and lessee. Since bad faith was proved in Millette, Phillips Petroleum did not pass the test of being a prudent operator.
To the same effect is Shell Oil Company v. James, 257 So.2d 488 (Miss. 1971). Mrs. Fannye M. James, acting as guardian for two minors, executed an oil, gas and mineral lease covering 200 acres of land in Smith County. A 1/2 interest was assigned by lessee, Pure Oil Company, to Shell Oil Company and by agreement Shell Oil Company became the operator. The lands were legally described as the SW 1/4 of the SW 1/4 of Section 5, the E 1/2 of the SW 1/4 of Section *543 5, and the N 1/2 of the NW 1/4 of Section 8, T-1-N, R-9-E. The 40-acre SW 1/4 of the SW 1/4 was combined with the NW 1/4 of the SW 1/4 (which had been leased by Mrs. E.M. Lane in a separate lease to Shell), to make a drilling unit of 80 acres. The E 1/2 of the SW 1/4 was an 80-acre drilling unit composed entirely of James lands. Lane No. 4 well was drilled on the 40 acres (NW 1/4 of SW 1/4), leased from Mrs. E.M. Lane. It was a good well and 1/2 of the royalty went to Mrs. Lane and 1/2 to the Jameses. The Jameses brought suit against Shell (contending that Lane No. 4 was draining oil from the 80-acre drilling unit [E 1/2 SW 1/4]), to require Shell to drill an offset well on the E 1/2 of the SW 1/4 (the 80-acre drilling unit composed entirely of James lands).
It was agreed by all witnesses that a fault line extended east and west along the quarter-section line between the N 1/2 and the S 1/2 of the SW 1/4.
In James, the first proposition to determine was whether there was drainage from the NE 1/4 of the SW 1/4 to the Lane well in the NW 1/4 of the SW 1/4. This Court said:
"If this issue is answered in the affirmative, we must determine whether or not the appellants acted as reasonable and prudent operators, under the circumstances, in refusing to drill. If the appellants did not so act, they are liable for the amount of the drainage, unless it can be said that there was sufficient counter-drainage to compensate the appellees for their loss."
257 So.2d at 491. (Emphasis added).
In reasoning out the answer to this question, we said that the Oil and Gas Board is authorized:
"(13) To prevent, so far as is practicable, reasonably avoidable drainage from each developed unit which is not equalized by counter-drainage. Sec. 6132-10, Miss. Code 1942 Ann. (Supp. 1971)."
257 So.2d at 493. (Emphasis added).
In concluding our opinion in James, this Court said:
"We cannot say from the evidence in this case that the Chancellor was in error in holding that there was a `substantial' amount of oil in paying quantities under the property of lessors in the NE 1/4 of the SW 1/4, Section 5, T-1-N, R-9-E, so that the lessees should have either drilled on this forty or they should have released it from their lease."

257 So.2d at 496. (Emphasis added).
The situation in the case at bar is clearly distinguishable from James. Conoco has drilled the equivalent of 8 oil wells on 38-acre drilling unit 31-11. All of the witnesses (those for the Blairs and those for Conoco) agreed that the wells on Unit 31-11 were geologically well located and would efficiently produce all of the recoverable oil from those pools on Unit 31-11. The evidence, both oral and documentary, proved that Conoco had met the test of being a prudent operator, who in all good faith had dealt fairly and equitably with all royalty owners large and small under the Kirkland lease.
Finally, the Blairs have benefited, rather than suffered, from the way in which the entire Kirkland lease was drilled and the oil produced therefrom. Although the percentage of acre feet of oil in tract 31-11 is only 20.20% of the Davis Field total, the percentage of production from tract 31-11 under the Kirkland lease was 36.13% up to May 1, 1979, and current production is 40.40% of the Kirkland lease.
The evidence was that Conoco had drilled far more wells and had conducted far more development in the Davis Field than had been done in any other field in the state of Mississippi. Both the Blairs' expert witness and Conoco's witness, independent geologist Wilbur Knight, testified that Conoco's drilling had resulted in an exceptional amount of development. Moreover, every witness acknowledged that the wells drilled by Conoco would efficiently produce all the recoverable oil under the Kirkland lease.
We conclude that the evidence, both oral and documentary, adduced at the trial and *544 contained in the record, clearly proves that Conoco has in all good faith prudently developed the entire Kirkland lease and that this prudent and efficient development of the lease has inured to the benefit of the Blairs, and that, even though they own only a very small fractional share of the royalty (three royalty acres in a 38-acre drilling unit), they have received their fair and equitable share of the royalty.
Because they have been treated fairly and equitably, the decree of the lower court in their favor must be reversed and judgment rendered here for appellant Conoco.
REVERSED AND RENDERED.
PATTERSON, C.J., SMITH, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and HAWKINS, JJ., concur.