**Ralph E. WILLIAMSON and his wife Daphine Williamson, Leslie Williamson, Judy Williamson Dunaway, Bonnie Williamson Morris, James Williamson, Ralph E. Thomas, Sammy L. Smith, S.E. Smith, Robert Sidney Dobbs, Jr., Flora R. Dobbs, Bobby G. Smith, Marion P. Smith, and Grace M. Smith, all Residents of Lowndes County, Mississippi, Plaintiffs,**

v.

**ELF AQUITAINE, INC., a Delaware Corporation, Defendant.**

No. 1:93CV255–S–D.

United States District Court,
N.D. Mississippi,
Eastern Division.

May 20, 1996.

---

7. It is possible, however, Mr. Sargent may have a viable claim against Mr. Phalen and/or the UMWA.

Daniel C. Hughes, Lafayette, LA, for Plaintiffs.

Otis Johnson, Jr., Gene D. Berry, Mark D. Morrison, Heidelberg & Woodliff, P.A., Jackson, MS, for Defendant.

## OPINION

SENTER, Chief Judge.

The instant case is presently before the court upon the parties' cross-motions for summary judgment, motions to strike certain affidavits, and plaintiffs' motion for continuance of motion for summary judgment. Although there are numerous questions involved, the focal issue presented to the court is narrow: whether lessors of a mineral interest in gas are entitled to royalties stemming from the nonrecoupable cash settlement of a take-or-pay contract dispute between a pipeline and a producer. As all parties have stipulated that there are no genuine issues of material fact, the case at bar is appropriately postured for a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

## I. INDUSTRY BACKGROUND [1]

Historically, pipelines in the natural gas industry were merchants, as opposed to mere transporters of gas. Pipelines would buy the gas from the producer under long term gas purchase contracts, then sell their supply to an end user. Typically these long term contracts between the pipeline and the producer contained take-or-pay provisions that committed the pipeline to pay, regardless of whether it physically took the gas.[2] Such a

---

**1.** This synopsis of the gas market was compiled from a variety of sources, including the parties' memoranda, case law and law review articles. *See Mobil Oil Exploration & Producing Southeast Inc. v. United Distribution Companies,* 498 U.S. 211, 111 S.Ct. 615, 112 L.Ed.2d 636 (1991); *Independent Petroleum Ass'n v. Babbitt,* Civ.A. Nos. 93–2544 & 94–2123, 1995 WL 431305 (D.D.C. June 14, 1995); Bruce M. Kramer, *Lia-bility to Royalty Owners For Proceeds From Take-or-Pay and Settlement Payments,* 15 E.Min. L.Found. § 14.01 (1994).

**2.** A take-or-pay clause is typically defined as a provision "requiring the purchaser to take, or failing to take, to pay for the minimum annual contract volume of gas which the producer-seller has available for delivery." Howard R. Williams

provision was mutually beneficial, as it guaranteed a consistent income for the producer while providing the pipeline a reliable source of gas.

Throughout the 1960s and the early 1970s, prices were relatively low and there was little incentive to explore for gas and develop new reserves. However, the energy shortages of the mid 1970s led to increased demand and renewed exploration due to the attractiveness of natural gas as a domestically produced fuel source. In the 1980s, in a further effort to promote the development of natural gas reserves, the federal government reduced regulations and encouraged competition. Concurrently, Congress promoted the use of alternative fuels. These conflicting forces increased the gas supply, yet decreased demand, thereby leading to a sharp decline in sales and market price. Thus, pursuant to their long term take-or-pay contracts, pipelines were required to buy gas at a cost significantly above the market price at which they could later sell it. Confronted with the prospect of bankruptcy, many pipelines refused to either take or pay for gas, despite their contractual commitments. Producers recognized that instability among the pipelines would ultimately be detrimental to their own interests by causing massive dislocation within the industry. Resultingly, most pipelines and producers agreed to reform their contracts and settle their disputes.

## II. FACTS

The plaintiffs are royalty owners under six separate oil, gas and mineral leases covering land in the Caledonia Field of Lowndes County, Mississippi. Defendant Elf Aquitaine [hereinafter Elf], as lessee, drilled two natural gas wells on land governed by these leases. Elf sold the gas produced from these wells to Tennessee Gas Pipeline Corporation [hereinafter TGP] under separate, long term take-or-pay contracts.

Beginning in the early 1980s, TGP experienced the same demand/supply problems that were affecting the industry as a whole.

& Charles J. Meyers, *Manual of Oil and Gas Terms* 1223 (1991). The pipeline then has the right to take the paid for but undelivered gas, termed "make-up gas," in succeeding years. *Id.*

TGP responded by unilaterally instituting an "Emergency Gas Purchase Policy," wherein it refused to fulfill its contractual obligations with Elf and its other gas suppliers. Although litigation was an alternative open to Elf, existing case law at the time did not guarantee a producer success on the merits of such a claim. Elf therefore chose to settle its dispute with TGP, and entered into an agreement in 1985 in which TGP paid Elf certain price deficiencies ($379,003.38) and take-or-pay monies ($200,000.00) in return for a reduction in its quantity obligations. This settlement was not disclosed to the royalty owners pursuant to a confidentiality agreement.

Despite the new contract, TGP continued to experience marketing difficulties. Resultingly, the parties negotiated another settlement in 1987, this time agreeing that TGP would make a single lump sum payment of $6,578,000.00 [3] in exchange for ELF's agreement to waive any past claims it may have had against TGP. Significantly, the parties additionally eliminated TGP's make-up rights under the take-or-pay clause of the old contract, and decreased the sales price for any future gas purchases made by TGP. This 1987 settlement was also subject to a confidentiality agreement.

In 1992, upon learning of the two settlements entered into by Elf and TGP, plaintiffs filed the instant cause of action.

## III. DISCUSSION

 Again, the preeminent issue before this court is whether royalty owners are entitled to a share of nonrecoupable cash payments resulting from a gas purchase contract settlement. As the court's jurisdictional basis is founded upon diversity of citizenship, this court is *Erie*-bound to apply Mississippi's state substantive law in resolving the question. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In a case where there is no official pronouncement of state law on an issue

3. TGP owed Elf more than four times the settlement amount in outstanding take-or-pay obligations, and Elf accounted for the settlement proceeds as a take-or-pay receipt.

which the district court must decide in order to conclude the case, the district court must make an *Erie* guess as to how the courts of that state would rule on the issue. *Munn v. Algee*, 730 F.Supp. 21, 26 (N.D.Miss.1990). Under Mississippi law, the court's preeminent guidepost is the principle that in the absence of any ambiguities, the lease must be enforced as written, giving effect to the plain language that was agreed to and signed by the parties. *Superior Oil Co. v. Beery*, 216 Miss. 664, 63 So.2d 115, 118 (1953). Accordingly, a determination as to whether or not the lessors in this action are entitled to royalties from the settlement must stem from the explicit lease provisions.

## A. The Plain Language of the Lease

Five of the six leases in the instant case are standard form leases and utilize identical language in setting forth Elf's royalty obligation. These leases provide:

> As royalty, lessee covenants and agrees: ... (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee of said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas....

The sixth lease is of an older form, and in regard to royalties, states:

> Royalties to be paid by lessee are: ... (b) on gas, including casinghead gas or other gaseous substances, produced from said land and sold or used, the market value at the well of one-eighth (⅛) of the gas so sold or used, provided that on gas sold at the well the royalty shall be one-eighth (⅛) of the amount realized from such sale....

Although today's issue is a matter of first impression in Mississippi, the court is not without guidance. The Mississippi Supreme Court has adhered to a general policy of adopting Texas law in cases involving previously unaddressed oil and gas issues.[4] *Phillips Petroleum Co. v. Millette*, 221 Miss. 1, 72 So.2d 176, 182 (1954). It is therefore appropriate that this court's analysis of the issue begin with Texas' seminal case involving royalties from take-or-pay gas contracts, *Killam Oil Company v. Bruni*, 806 S.W.2d 264 (Tex. App.1991) (hereinafter referred to as *Bruni I* ).

*Bruni I* presented a factual scenario similar to that involved in the instant case. The producer, Killam Oil, had entered into a settlement with its pipeline in regard to a substantial take-or-pay deficiency that had arisen as a result of the depressed natural gas market. The settlement provided cash payments to Killam Oil in return for a release of the pipeline's obligations under the contract.[5] Upon learning of the agreement, the lessor, Bruni, sued Killam Oil for its failure to pay royalties on the settlement. Although the trial court granted summary judgment in favor of Bruni, this decision was reversed by the Texas Court of Appeals. The Appeals Court held as a matter of law that Bruni was not entitled to royalty on settlement proceeds arising from the take-or-pay provision of the contract between Killam Oil and the pipeline. The court premised this determination on the fact that the lease only entitled Bruni to royalty payments when gas was produced. As it was well established under Texas law that the term "production" required actual physical extraction of the mineral from the earth, the court found that no royalties were owed. The settlement did not call for future mineral extraction, and indeed, the agreement was founded upon a lack of production. Additionally, the take-or-pay contract and the resulting settlement were independent of the lease. Therefore, the court held that the settlement did not effect the landowner's rights because no gas had been produced.

---

**4.** In oil and gas issues of first impression, the Mississippi Supreme Court will typically follow Texas decisions when the court is satisfied with "the soundness of the reasoning by which they are supported." *Phillips Petroleum*, 72 So.2d at 182. Thus, although the court is to give due weight to Texas case law, the court is in no way bound by such authorities.

**5.** The lease in *Bruni I* was virtually identical to the second lease form, outlined above, in the instant case.

Although it initially appeared that *Bruni I* had provided the bedrock law upon which all future take-or-pay settlement issues could be resolved, a subsequent decision raised numerous questions regarding the holding's scope. *Hurd Enterprises, Ltd. v. Bruni* (hereinafter referred to as *Bruni II*) evolved out of *Bruni I* and resultingly involved similar issues, but the focus of the *Bruni II* court's analysis involved the nature of the lessor/lessee relationship and certain implied covenants within the gas lease. *Hurd Enterprises v. Bruni,* 828 S.W.2d 101 (Tex.App. 1992). In regard to the issue of whether royalties were owed on the take-or-pay settlement, the court stated that it was bound by the law of the case, as established in *Bruni I.* Therefore, the issue was not before the court for review. However, the court did suggest that it was dissatisfied with the previous holding, due to *Bruni I*'s failure to distinguish between recoupable and nonrecoupable settlements. *Id.* at 106–07 n. 8. The *Bruni II* court stated that a nonrecoupable settlement, similar to that in the instant case, raised special concerns relating to the royalty owners interest. The court briefly referred to several "cogent arguments" that called for the payment of royalties in situations when a settlement extinguished a pipeline's recoupment rights. The court thereby demonstrated a willingness to interpret the plain meaning of the lease in light of the realities of the gas industry. But again, the court stated that the recoupment issue was not properly before the panel. Thus, although Texas law was apparently settled in regard to royalties on recoupable take-or-pay settlements, the Texas Court of Appeals in *Bruni II* evinced its belief that the prior holdings had left unresolved the issue of a landowner's interest in a nonrecoupable settlement.

In applying this analysis to the instant case, the court agrees with the logic of *Bruni I* and *Bruni II,* in that the royalty provisions in the leases were not triggered until production occurred. *See also Piney Woods Country Life Sch. v. Shell Oil Co.,* 726 F.2d 225, 234–35 (5th Cir.1984) (applying Mississippi law in finding that production occurs when gas is brought to surface). However, the court is not governed by *Bruni I*'s general holding that take-or-pay settlements are not subject to royalty obligations. As noted in *Bruni II, Bruni I* failed to make a distinction between a settlement that merely remedies past-due take-or-pay obligations, and a settlement that terminates the producer's make-up rights and is actually a buy-down or buy-out agreement.[6]

In a recoupable settlement, the lessor can receive a royalty share of the settlement if the pipeline later exercises its make-up rights on gas previously paid for pursuant to the take-or-pay obligation. It is therefore probable that the royalty owner will ultimately gain a significant economic benefit and thereby share in the advantages of the settlement. However, in a nonrecoupable settlement, all make-up rights are terminated and the lessee receives a lump sum payment. Thus, as the original contract is no longer valid and all prior obligations have been terminated, the possibility of earning a royalty on the make-up gas and thereby eventually sharing in the settlement proceeds does not exist for the lessor. *See Bruni II,* 828 S.W.2d at 106–07 n. 8.

This is a critical distinction between recoupable and nonrecoupable settlements. Therefore, in considering a lessee's duty to pay royalties on a settlement, precedent that does not address the unique ramifications of nonrecoupable settlements does not necessarily govern the issue of whether production has occurred.[7] *See also* Ernest E. Smith &

---

6. Whereas a take-or-pay settlement is explicitly related to an outstanding take-or-pay claim and is usually for less than the face value of the claim, buy-outs and buy-downs are much more broad and involve modifications to the contract provisions. John Lowe, *Defining the Royalty Provisions,* 49 SMU L.Rev. 223, 226 n. 15–17 (1996). Under the terms' standard definitions, a buy-out payment terminates the purchaser's make-up rights under the old contract, while a

buy-down payment reduces the purchase price for gas under an amended or successor contract. *Id.*

7. The issue of whether royalty obligations attach to true take-or-pay payments or settlements is a topic that both courts and commentators have thoroughly explored. *See generally Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159 (5th Cir.1988); Lowe, *supra,* at 227–28 n.

Jacqueline Lange Weaver, 1 Texas Law of Oil and Gas § 4.6(E)(6)(b), at 215–1 to 215–4 (1995) (noting distinction between settlements and conventional take-or-pay payments). In a nonrecoupable settlement, it is evident that the settlement proceeds are not merely past-due take-or-pay proceeds. If they were, the pipeline would have retained post-settlement rights to make-up gas. However, in giving up this right, TGP merely afforded Elf a lump sum windfall tied to no future obligations. Resultingly, the gross proceeds Elf actually received as a result of production were substantially greater than the apparent value of production. Thus, the settlement proceeds were directly related to Elf's production of gas, and pursuant to the lease, Elf was obligated to pay royalties on the amount realized for the sale of gas.[8]

A finding that Elf's nonrecoupable settlement was grounded in the production of gas is consistent with language found in analogous cases. As noted above, *Bruni II* referenced a number of arguments regarding the inequities created when make-up rights are extinguished, and the Texas court further recognized the reasonableness of inferring a relationship between settlement proceeds and production. *Bruni II*, S.W.2d at 106–07 n. 8. The Louisiana case of *Frey v. Amoco Production Co.* is also instructive, although the rationale is partially inapplicable to the instant case due to the fact that the holding was primarily founded on a construction of state law. *Frey v. Amoco Production Co.*, 603 So.2d 166 (La.1992). Nonetheless, whereas Fifth Circuit Judge Edith Jones' concurrence specifically stated that *Frey* did not overrule *Diamond Shamrock* (a prior Fifth Circuit case denying royalties on take-or-pay payments), the Judge included a caveat noting the complexities of the issue and inferring that in a case analogous to the instant action, a future panel would not be bound by *Diamond Shamrock*'s rationale regarding production-based leases.[9] *Frey*, 943 F.2d at 588–89; *Diamond Shamrock*, 853 F.2d at 1167–68. Although these statements are merely dicta, *Bruni II* and *Frey* point to a growing recognition in both Texas and the Fifth Circuit that a lessor does in some circumstances have the right to share in settlement proceeds.[10]

Most recently, in *Transamerican Natural Gas Corp. v. Finkelstein*, the Texas Court of

24 (providing list of citations). Again, however, the key to analyzing the case at bar is the recognition that the settlement significantly modified the contract and extinguished TGP's make-up rights. Thus, the new agreement was not a mere settlement of TGP's take-or-pay obligation. *See also* Randy King, *Royalty Owner Claims to Take-or-Pay Payments Under the Implied Covenant to Market and the Duty of Good Faith and Fair Dealing*, 33 S.Tex.L.Rev. 801 (1992). Accordingly, typical *arguments against requiring royalties on take-or-pay proceeds are inapplicable in this context.*

8. Defendant stated in its brief that the pertinent lease provision required Elf to pay royalties on the amount realized from production. Thus, because the nonrecoupable settlement effectively increased the gross profit Elf gained through past production, the proceeds must be accounted for as a portion of the amount realized from those past sales.

9. Although the Fifth Circuit's opinion in *Frey* was later withdrawn in part, the precedential value of the decision was preserved when the court reinstated the withdrawn portion in light of the Louisiana Supreme Court's certification of the issue and subsequent opinion. *See Frey v. Amoco Production Co.*, 951 F.2d 67 (5th Cir.1992); *Frey v. Amoco Production Co.*, 943 F.2d 578, 588 (5th Cir.1991); *Frey*, 603 So.2d at 166 (La.1992).

Therefore, the holding and rationale remain sound, and Judge Jones' observations noting various opposing arguments undergird the court's recognition that nonrecoupable settlements involve unique considerations which prior case law has typically failed to address. *Frey*, 943 F.2d at 588–89.

10. Elf argued in its brief that such a holding would result in the payment of two royalties: one on the gas produced, and another on the settlement proceeds. However, it is typically argued that such complexities arise when the settlement is held to be royalty-bearing pursuant to contractual agreements regarding future production. *See In Re Century Offshore Management Corp.*, 185 B.R. 734, 741 (E.D.Ky.1995) (basing denial of royalties on construction of federal regulations and authorities). The court today holds that the economic benefits of the settlement are primarily derived from Elf's past production of gas. Therefore, although a lessor may in fact receive two checks, the aggregate amount should properly be viewed as one royalty payment.

Although it is possible that the court could determine that a portion of the settlement proceeds are attributable as an advance on future production, a more precise delineation of the settlement's ramifications in regard to production is reserved for a future damages hearing.

Appeals revisited *Bruni I,* and in doing so, refined and limited its scope. *Transamerican Natural Gas Corp. v. Finkelstein,* No. 04–95–00365–CV, 1996 WL 148175, —— S.W.2d —— (Tex.App. April 3, 1996). The particular issue before the court was whether repudiation damages stemming from a take-or-pay contract were royalty bearing. Significantly, the court found that repudiation damages were in the nature of a nonrecoupable buyout and therefore "had the practical effect of increasing the price paid for gas actually produced." *Finkelstein,* 1996 WL 148175, at *10, —— S.W.2d at —— (quoting Ernest E. Smith, *Royalty Issues: Take or Pay Claims and Division Orders,* 24 Tulsa L.J. 509, 518 (1989)). Thus, in construing the language of *Bruni II* regarding nonrecoupable settlements, the court held that equity, and specifically the implied duty to market, demanded the payment of royalties on the repudiation damages. Although the court acknowledges that *Finkelstein's* factual scenario renders it partially distinguishable from the case *sub judice,* the holding and rationale remain relevant because the Texas court interpreted the lease in light of the practical realities of the gas market.[11]

By definition, the so-called "plain meaning" approach traditionally utilized by Texas courts in interpreting oil and gas leases bars any consideration of extrinsic evidence. *See Mandell v. Hamman Oil and Refining Co.,* 822 S.W.2d 153, 159 (Tex.App.1991). Similarly, the circumstances of the instant case, much like those in *Finkelstein,* do not require an examination of parol evidence, and furthermore are distinguishable from those cases in which take-or-pay proceeds are tied to the non-production of gas, as in *Mandell.* Thus, a court's finding that nonrecoupable settlements are indeed royalty-bearing, based on the fact that production has occurred, is consistent with the Texas courts' literal interpretations of lease language.

Moreover, judicial decisions that infuse an examination of the equities of settlements within an interpretation of the lease language itself, even within a "plain meaning" jurisdiction as in Texas, comport with the following analytical considerations involving implied covenants imposed under Mississippi case law.

### B. Implied Covenant Analysis

▮▮▮▮ Coupled with the duty created by the express language of the leases' royalty provisions, Elf's obligation to pay royalties on the settlement proceeds arose under Mississippi's implied contractual covenants. As stated by the Fifth Circuit, "[b]ecause of a lessee's exclusive control over the production and development of oil and gas, the law imposes upon the lessee certain implied covenants; namely, to reasonably develop, produce, operate and market production." *Piney Woods Country Life School v. Shell Oil Co.,* 539 F.Supp. 957, 973 (S.D.Miss.1982), *rev'd in part on other grounds,* 726 F.2d 225 (5th Cir.1984). However, the Mississippi Supreme Court has held that implied covenants are inapplicable when express provisions within a lease govern a particular issue. *Lloyd's Estate v. Mullen Tractor & Equip. Co.,* 192 Miss. 62, 4 So.2d 282, 287 (1941). Thus, implied covenants are only superimposed on a contract to glean the parties' intent in the absence of relevant lease provisions. The goal of construing implied covenants is to ensure that the contract best reflects the parties' reasonable expectations. The court's function is not to rewrite the contract, but rather, to construe the agreement in light of fundamental, equitable principles of contract law. Because the lease fails to provide whether Elf's royalty obligation attaches to nonrecoupable settlements following the breach of take-or-pay contracts, it is plausible that the Mississippi Supreme Court would find that the circumstances of the instant action warrant the application of implied covenants.

---

11. Much like the Texas panel in *Finkelstein,* the court recognizes that there is currently substantial disagreement as to whether nonrecoupable settlements constitute "gross proceeds" and are thereby royalty bearing under federal regulations. *Finkelstein,* 1996 WL 148175, at *10, —— S.W.2d at ——; *compare Babbitt,* 1995 WL

431305 at *9–11, with *In Re Century Offshore Management Corp.,* 185 B.R. at 740. However, the court has resolved the royalty issue at bar pursuant to a construction of Mississippi law and the particular lease language agreed to by the parties. Thus, although such precedent is relevant and insightful, it is not controlling.

The covenant applicable to the instant analysis is the implied covenant to market produced gas.[12] The Mississippi Supreme Court has often recognized the existence of this implied duty, as has the Fifth Circuit in applying Mississippi law. *Piney Woods,* 539 F.Supp. at 973. Although neither court has provided specific guidance as to the parameters of the implied covenant to market, the Mississippi Supreme Court has adopted the rule that a lessee bound by implied obligations is held to the standard of conduct of the "prudent operator." *Southwest Gas Producing Co. v. Seale,* 191 So.2d 115, 119–20 (Miss.1966). In this regard, *Piney Woods* stated that the test "is whether or not the lessee has used due care and diligence. Due care and diligence is defined as that care and diligence which would be exercised in a particular situation with due regard to *the interests of both lessor and lessee." Piney Woods,* 539 F.Supp. at 973–74 (emphasis added).

█ Additional guidance as to the scope of this duty is provided through an examination of *Bruni II. Bruni II,* 828 S.W.2d at 101. As noted above, the Texas Court of Appeals suggested that the prudent operator standard was too lenient when applied to take-or-pay settlements in which the parties extinguished the pipeline's make-up rights. *Id.* at 112. Prior to finding that a breach of the duty of good faith had occurred, the court was bound by precedent to find first that a confidential relationship existed. *Id.* However, courts construing Mississippi law are not similarly bound.[13] Indeed, at least four Mississippi cases have applied equitable principles in establishing the duty a lessee owes to a lessor. Furthermore, these cases have,

both expressly and impliedly, referred to good faith as an intrinsic aspect of the prudent operator standard. *See Continental Oil v. Blair,* 397 So.2d 538, 540 (Miss.1981) (holding that "the prudent operator standard is inextricably tied in with the principles of equity ... [and] requires good faith dealing between the lessor and lessee"); *Monsanto Chemical Company v. Sykes,* 245 Miss. 207, 147 So.2d 290, 297 (1962) (finding that duty of good faith is inherent aspect of prudent operator rule); *see also Seale,* 191 So.2d at 121–22 (Miss.1966) (recognizing implied covenant of good faith and fair dealing in gas pooling clause); *Phillips Petroleum,* 72 So.2d at 183 (finding duty of good faith owed to lessor by lessee).

█ Furthermore, natural gas transactions in general are governed by Article 2 of the Mississippi Uniform Commercial Code. *See Southern Natural Gas Co. v. Pursue Energy,* 781 F.2d 1079, 1081 n. 3 (5th Cir. 1986); Miss.Code Ann. § 75–2–107(1) (1972). It is fundamental that every contract or duty regulated by the UCC carries with it an implicit obligation of good faith.[14] Miss.Code Ann. § 75–1–203.

█ In construing this language, and in particular the Mississippi Supreme Court's holding in *Continental Oil v. Blair,* it is clear that the application of the prudent operator standard in Mississippi requires a two-prong analysis: the first involving a technical marketing analysis, and the second examining the duty of good faith. *Continental Oil,* 397 So.2d at 543–44. Although *Continental Oil* involved the implied covenant to develop the lease, the intended protection the covenant affords a lessor is substantially similar to the

---

**12.** In *Mandell,* the Texas Court of Appeals held the implied covenant *to market was not applicable* to take-or-pay payments when the lease required production. *Mandell,* 822 S.W.2d at 164–65. The court's rationale was that take-or-pay was for nonproduction, and if no gas had been produced there was nothing to market. *Id.* However, in the instant case, the buydown/buyout agreement was intrinsically related to the production of gas. Thus, *Mandell's* holding regarding the implied covenant to market is inapplicable under the present circumstances.

**13.** In general, all Mississippi contracts "contain an implied covenant of good faith and fair deal-

ing in performance and enforcement." *Cenac v. Murry,* 609 So.2d 1257, 1272 (Miss.1992). Significantly, this rule is contrary to Texas law, in which there is no general duty of good faith in contracts. *See Matter of Fender,* 12 F.3d 480, 486 (5th Cir.1994).

**14.** "Good faith" is mentioned over 50 times in the 400 sections of the UCC, as noted by Professor E. Allen Farnsworth. Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code,* 30 U.Chi.L.Rev. 666, 667 (1963).

implied duty to market. Thus, the relevant obligations of the lessee in *Continental Oil* are analogous to the instant case and provide guidance in determining whether Elf satisfied its duties owed to its lessors.

■ In applying this standard, the court must first determine whether Elf prudently and efficiently marketed the gas produced. *Id.* Secondly, the court must determine whether the lessors received a fair and equitable share of the royalty pursuant to the lease. *Id.* In this regard, the economic realities of the gas market in the 1980s and the evidence provided relating to Elf's increased sales after the 1987 settlement indicate that at best the settlement was a prudent business decision, and at worst, it did not violate the first prong of Mississippi's implied covenant to market. As stated by the Louisiana Supreme Court in *Frey* II, "the producer who failed to renegotiate a long term gas contract in the face of the pipeline's financial inability to perform fully under a long term gas purchase contract, given the market conditions caused by the decline in demand and the rise in producer-pipeline litigation, would also likely to be deemed to have acted imprudently." *Frey,* 603 So.2d at 181.

■ Although the court finds that Elf's decision to settle with TGP was prudent, its failure to share the economic benefits of that decision with its lessors nonetheless represented a breach of the good faith obligations inherent within the implied covenant to market. *See, e.g., Klein v. Arkoma Production Co.,* 73 F.3d 779, 787 (8th Cir.1996) (holding that "the breach in this case is neither the decision to settle, nor the decision to reform the contract, but the failure to share the

benefits of the settlement with the beneficial owners of those proceeds"). The duty Elf owed to its lessors was not that of a fiduciary, and it had the right to take certain actions necessary to safeguard its interests. On the other hand, the protections provided by the general obligation of good faith ensure that the lessor is not at the mercy of the lessee. As stated in *Piney Woods,* a producer is obligated to give due regard to the interests of its lessors. *Piney Woods,* 539 F.Supp. at 974.

The Mississippi Supreme Court's traditional requirement that a lessee adhere to a standard of good faith and fair dealing provides the foundation for the court's holding that Elf breached its implied covenant to market with the royalty owners when it did not pay royalties on a settlement that effectively increased the price of gas per Mcf.[15] A nonrecoupable settlement yields an economic benefit obtained by the lessee through the lease itself. The termination of make-up rights places the great weight of the settlement's benefits on the side of the producer, thereby ensuring that the benefits do not inure to the mutual advantage of both parties, but instead represent a windfall. Good faith requires that such proceeds be shared among both parties to the lease.[16]

■ Some commentators have suggested that a bright-line rule regarding royalty obligations on all take-or-pay settlements is preferable to a rule that delineates between the types of settlements to which pipelines and producers agree. The court recognizes that the amount of money involved in this and similar settlements does provide a producer a substantial incentive to attempt to escape his

---

**15.** Mcf is the standard unit for measuring natural gas volume and is defined as one thousand cubic feet. *Bruni II,* 828 S.W.2d at 104 n. 4.

**16.** The court's holding today applying equitable principles and implied covenant analysis within an examination of take-or-pay settlements and buy-down/but-out agreements is not novel. Other jurisdictions have utilized a similar legal framework. *See Klein,* 73 F.3d 779, 785–88 (8th Cir.1996); *Klein v. Jones,* 980 F.2d 521 (8th Cir.1992) (noting that "[t]he writings in reference to this problem show a strong, developing recognition that a restrictive interpretation of the

royalties clause in a conventional lease can be inconsistent with its basic purpose, and can produce results that are unintended by the parties, and unfair to the lessor"); *Frey* 943 F.2d at 588; *Frey,* 603 So.2d at 172 (stating that although court was "disinclined to write a mineral lease in pursuit of equity, we are nonetheless cognizant [that] the terms of a mineral lease are neither intended to, nor capable of, accommodating every eventuality"). Although these holdings were specifically grounded in the governing state case law of the courts' respective jurisdictions, the rationale on which the courts relied is consistent with Mississippi precedent.

royalty obligations through clever draftsmanship. However, the court's holding today serves as notice that a royalty obligation does not rest merely on the particular language chosen by the producer's lawyers in drafting a settlement document. Indeed, it is not the settlement but the plain language of the lease that governs the relationship of the parties. Further, a lessee is also subject to the commensurate principle that all actions taken by parties to a lease that invoke the application of Mississippi's implied covenants are governed to a standard of good faith.

### C. Fraudulent Concealment and the Statute of Limitations

Mississippi Code Ann. § 15–1–49 provides the general statute of limitations applicable to the instant action. The statute required Elf to bring a claim within six years of the date on which the action accrued.[17] Because plaintiffs allege that each settlement constituted a separate breach, it is clear that the 1985 settlement falls outside the required six year period for an action brought in 1992.

Furthermore, plaintiff's claims relating to the 1985 settlement are not protected by the unique limitations rules that govern claims involving fraudulent concealment. *See* Miss.Code Ann. § 15–1–67. As stated by the Fifth Circuit:

> Rule 9(b) of the Federal Rules of Civil Procedure requires that in all averments of fraud, the circumstances constituting fraud or mistake shall be stated with particularity. Although the defendant's state of mind may be averred generally, Rule 9(b) requires the plaintiff to allege the existence of facts and circumstances sufficient to warrant the pleaded conclusion that fraud has occurred or face dismissal of his claim. Allegations of fraud must thus meet a higher, or more strict, standard than the basic notice pleading required by Rule 8.... Although we recognize that Rules 8 and 9(b) are to be harmonized, Rule 8 has never been read to eviscerate Rule 9(b)'s

requirement that an averment of fraud must be stated with particularity. *Norman v. Apache Corp.*, 19 F.3d 1017, 1022–23 (5th Cir.1994) (internal quotations and citations omitted). Although plaintiffs' complaint does make a general reference to Elf's failure to disclose the settlement's terms, it does not specifically base liability on an allegation of fraud·or fraudulent concealment. Therefore, because the complaint did not allege fraud with particularity, any claims relating to the 1985 settlement are barred by the applicable statute of limitations.

### III. REMAINING MOTIONS

Both plaintiff and defendant have moved to strike certain opposing affidavits. Specifically, defendant moved to strike the affidavit of Howard McKissack, and in turn, plaintiff moved to strike the affidavit of Kevin Drake. However, in considering the circumstances of the instant action, as well as the general proposition that the law favors admission of evidence in non-jury trials, the court reviewed the affidavits and did not rely on the substantive aspects of the those provisions the parties sought to omit. *See Refinemet International Co. v. Eastbourne N.V.*, 815 F.Supp.· 738, 740 (S.D.N.Y.1993); *see also Hunter Distributing Co. v. Pure Beverage Partners*, 820 F.Supp. 284, 284 n. 1 (N.D.Miss.1993). Accordingly, both motions to strike are denied.

Lastly, plaintiffs' "motion for continuance of motion for summary judgment" is denied. Plaintiffs founded this motion on an asserted need to conduct further discovery. However, substantial discovery has since occurred, and various conversations with counsel have made the court certain that neither party now desires a continuance.

### III. CONCLUSION

Having thoroughly reviewed the applicable authorities, as well as the memoranda of law and the voluminous documentary evidence provided by the parties, the court finds as a matter of law that the 1987 nonrecoupable settlement between TGP and ELf was royal-

---

**17.** Pursuant to a legislative amendment in 1989, the statute now provides for a three year limitation. However, the alleged breaches of the contracts occurred prior to the effective date of the amendment and therefore, the six year period is appropriate.

ty-bearing for which defendant is now liable, but that plaintiffs' claim relating to the 1985 settlement is barred by the applicable statute of limitations. Accordingly, defendant's motion for summary judgment is denied, and plaintiffs' motion for summary judgment is granted. Both parties' motions to strike are denied, and plaintiffs' motion for a continuance is denied.

The court will hold a hearing in regard to the issue of damages at the earliest possible setting. However, without expressing its opinion at this time or interfering with the judgment of counsel, the court suggests that defendant may wish to request, pursuant to 28 U.S.C. § 1292(b), an interlocutory appeal of this order. Of course, the burden would be on defendant to establish its right to such a procedure, and plaintiffs would have an opportunity to oppose this request, if made. Unfortunately, Rule 20 of the Mississippi Supreme Court Rules, which governs certified questions from federal courts, is not available to this court but may be utilized by the United States Court of Appeals for the Fifth Circuit. *See White v. Esmark Apparel, Inc.,* 788 F.Supp. 907, 909 (N.D.Miss.1992).

An order in accordance with this opinion shall be issued.