982 So.2d 415 (2007)
Preston O. GILL, Appellant
v.
Brenda Royals GIPSON, Judy Royals McInnis, Catherine Royals Jones, Deborah Royals Norton and Christy Renee Royals, Appellees.
No. 2006-CA-00166-COA.
Court of Appeals of Mississippi.
August 14, 2007.
Rehearing Denied January 15, 2008.
*417 R. Andrew Foxworth, attorney for appellant.
Lawrence C. Gunn, Jr., attorney for appellees.
Before MYERS, P.J., CHANDLER and GRIFFIS, JJ.
GRIFFIS, J., for the Court.
¶1. The Appellees commenced this action by filing their complaint to confirm title to overriding royalty interest in oil, gas, and minerals, to recover monies erroneously paid and for attorney's fees. The essential claim presented is to interpret and enforce the Royals' 1/8 interest in an oil, gas and mineral lease. After a trial, the chancellor awarded a judgment against Preston O. Gill in the amount of $55,538 for oil royalties, $40,272 for gas royalties, prejudgment interest in the amounts of $11,767 and $7,969 for the oil and gas royalties, respectively, future royalties, punitive damages in the amount of $10,000 and attorney's fees in the amount of $10,000. On appeal, Gill argues that there was reversible error in the chancellor: (1) finding and interpreting the assignment that imposed an overriding royalty in favor of the Royals; (2) finding the Royals were entitled to prejudgment interest; (3) finding the Royals were entitled to punitive damages and attorney's fees; and (4) not finding that the assignment provision violated the rule against perpetuities.

FACTS
¶2. Wessie Mae Lowe was the sole owner of approximately eighty-four acres of land in Pearl River County, Mississippi. On June 16, 1970, she executed an oil, gas and mineral lease (the "lease") in favor of D.L. Royals. The lease contained a clause that if there was no oil or gas production for a period of sixty consecutive days the lease would automatically terminate. A well was located on a portion of the property and it became known as the "A.L. Lowe #1."
¶3. D.L. Royals operated the well from 1970 until his death in 1989. After his death, his daughter, Brenda Gipson, operated the well. After his death, D.L. Royals' interest in the lease passed to his heirs, the appellees in this action (the "Royals").
¶4. Preston O. Gill is a landman. Gill attempted to negotiate the purchase of the well for his client, William C. Culp (owner of L & M Oil, Inc. and C.C.M. Enterprises, Inc.) and his prospective business joint venturer, John M. Dubose, Sr. (owner of Blue Diamond, Inc.). At that time, Gill was the exclusive agent for L & M Oil, Inc. and C.C.M. Enterprises, Inc.
¶5. In 1991, the Royals were approached by Dubose about acquiring the lease and were informed that Gill would contact them about the proposal. Gill and Dubose then presented the Royals an offer to purchase the lease. The offer was presented by Gill, on behalf of L & M Oil, Inc., and Dubose, on behalf of Blue Diamond, *418 Inc. Gill had no ownership of either company. The offer presented was rejected by the Royals.
¶6. After speaking with Dubose and his son, John Dubose, Jr. ("Tap"), Gill was asked to present an offer on behalf of PRP, Inc. PRP, Inc. was a new corporation solely owned by Tap. After receiving permission from L & M Oil, Inc., Gill presented PRP, Inc.'s offer to the Royals.
¶7. On July 4, 1991, the Royals assigned their interest in the Lease to PRP, Inc. The assignment of the lease contained the following provision, which is a the center of this dispute.
9. RESERVATION OF OVERRIDING ROYALTY As a further consideration for the execution of this assignment, Assignor hereby reserves unto itself, its successors and assigns, and Assignee hereby grants and conveys to Assignor, as an overriding royalty, one-eight of eight-eighths (1/8 of 8/8) part of all oil, gas, and other minerals produced and marketed or used from the assigned acreage, and being free of all costs of operation, by this assignment under and by virtue of the lease hereby assigned or any renewals or extensions thereof.
Also, if the lease hereby partially assigned should expire for any reason and Assignee or any of its employees, agents or any corporation in which Assignee or any of said persons has any interest shall secure any future lease of the assigned acreage or any production of oil, gas and other minerals in, on and under the land described in the lease hereby partially assigned, the Assignor shall receive an overriding royalty of one-eighth of eight eighths (1/8 of 8/8) of all oil, gas and other minerals produced and marketed or used from said property, being free from all costs of operation.
¶8. At trial, Gill described his involvement in this transaction as a "courtesy" for the Royals and PRP, Inc. Less than two months later, on August 23, 1991, PRP, Inc. assigned Gill a 2.5% carried working interest and a 1.875% net revenue interest in the lease.
¶9. Three years later, on August 23, 1994, PRP, Inc. assigned its interest in the lease to Trinity Oil & Gas Development, Inc. Then, on August 26, 1997, Trinity assigned its interest to Gill.
¶10. Gill continued production of A.L. Lowe #1 until October of 1998. Then, for the alleged reason of increased costs, Gill ceased production of oil and gas from A.L. Lowe # 1. The well was shut in, but not plugged.
¶11. Gill then called Donald Wayne Lowe and asked him what did he want to do. At that time, Lowe was the current owner of the land and all mineral interests since, as Gill claimed, the lease was terminated. Lowe told Gill that he wanted a new lease. On March 31, 1999, Lowe executed an oil, gas and mineral lease to Preston O. Gill Operating Company. The lease was prepared by Gill. This lease was executed approximately three months after Gill ceased production on A.L. Lowe #1.
¶12. On February 8, 2000, Gill, individually and not on behalf of Preston O. Gill Operating Company, assigned a ten percent working interest and ten percent net revenue interest in the lease to Lowe. In this assignment, Gill claimed that he was the owner of the entire working interest and net revenue interest on the A.L. Lowe #1 well.
¶13. After February of 1999, the Royals received no more royalties under the 1991 lease. They were never informed that the well was to be shut down in 1999. Gill claimed that the underlying lease terminated automatically after sixty days *419 passed without production. Gill claims that with the expiration of the original lease, the Royals' rights to royalties likewise terminated.
¶14. On July 28, 2001, the Royals commenced this action and filed their complaint to confirm title to overriding royalty interest in oil, gas, and minerals, to recover monies erroneously paid and for attorney's fees. The chancellor rendered a memorandum opinion that found that Preston Gill was an agent of PRP, Inc. and had breached a duty of good faith and fair dealing with the Royals. The chancellor then entered a final judgment that awarded the Royals $42,734.62 for oil royalties and $29,469.72 for gas royalties. The chancellor also awarded the Royals prejudgment interest in the amounts of $11,236.27 and $7,474,71 for the oil and gas royalties due. In addition, the chancellor awarded the Royals $10,000 in punitive damages and $10,000 in attorney's fees. It is from this judgment that Gill appeals.

STANDARD OF REVIEW
¶15. A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Sanderson v. Sanderson, 824 So.2d 623, 625 (¶8) (Miss. 2002). This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 625-26 (¶8).

ANALYSIS
I. Whether the chancellor was manifestly wrong in his finding and interpretation of the assignment that imposed an overriding royalty in favor of the Royals.
¶16. Gill alleges that paragraph 9 of the Royals' assignment to PRP, Inc. should not apply to the newly formed lease between Preston O. Gill Operating Company and Donald Wayne Lowe. He states for several reasons that he is not bound by the terms of the assignment; these include: the assignment is not binding on any employees, agents or representatives of PRP, Inc.; the assignment is a personal covenant and does not run with the land; the measuring date whether Gill was an agent of PRP, Inc., is the date of the new oil and gas lease; and Gill was never an agent or employee of PRP, Inc. Gill also recognizes that there are no Mississippi cases directly on point to govern this appeal and states that this may be a matter of first impression before the courts of this State.
¶17. Gill claims that paragraph 9 does not bind an agent or employee of PRP, Inc. However, Gill cites us to no legal authority for this position. Nevertheless, it has no merit.
¶18. The chancellor's opinion addressed this issue as follows:
Defendants argue that it is immaterial to find Gill an agent of PRP, Inc. as the language of paragraph 9 of the Assignment would be against public policy for a corporation to restrict its employee or agent without their permission. However, here Gill not only had actual knowledge of the provision, he actually stepped into the shoes of PRP, Inc. by making an affirmative decision to acquire full ownership of the lease with knowledge of the provision, thus going beyond being characterized as an agent for another in relation to the well production.

(emphasis added). The chancellor determined that Gill's capacity as an agent or employee of PRP, Inc. had no bearing on this issue because Gill became bound by this contractual provision by virtue of the assignment of the Lease from Trinity to *420 Gill. By the assignment to him individually, Paragraph 9 became a contractual obligation of Gill, individually, when he accepted the assignment of the lease from Trinity.
¶19. The chancellor's memorandum opinion does indeed reference Gill's status as an agent for PRP, Inc. Nevertheless, it is apparent that the chancellor's finding did not turn on this fact alone. The chancellor's opinion recognized that Gill "actually stepped into the shoes of PRP, Inc. by making an affirmative decision to acquire full ownership of the lease with knowledge of the provision."
¶20. The original lease included an automatic termination provision. The lease was to automatically terminate if the well did not produce for a period of more than sixty days. Aware of this automatic termination provision, the Royals assigned the lease to PRP, Inc. and included the following condition, reduced to its essence:
9. RESERVATION OF OVERRIDING ROYALTY. . . .
[I]f . . . Assignee or any of its . . . agents or any corporation in which Assignee or any of said persons has any interest shall secure any future lease of the assigned acreage or any production of oil, gas and other minerals in, on and under the land described in the lease hereby partially assigned, the Assignor shall receive an overriding royalty of one-eighth of eight eighths (1/8 of 8/8) of all oil, gas and other minerals produced and marketed or used from said property, being free from all costs of operation.
¶21. This provision created an implied covenant upon PRP, Inc., then Trinity, and then Gill, to continue production of the well to prevent the lease from terminating. Gill eventually obtained exclusive control over the production and development of the well, since he owned the working interest. Gill was bound by the standard of conduct known as the "prudent operator." Southwest Gas Producing Co. v. Seale, 191 So.2d 115, 119 (Miss.1966). The standard required that Gill's conduct be "[w]hatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required." Id. at 119-20 (quoting Brewster v. Lanyon Zinc Co., 140 F. 801, 814 (8th Cir.1905)).
¶22. The chancellor found that the net effect of Gill's conduct was to terminate the interest of the Royals. Given the discretion that the chancellor's findings of facts are accorded, the evidence supports his finding. After Gill had received ownership in the working interest of the well, he maintained production for fourteen months. Then, in October of 1998, he ceased production for what he called cost overruns. While he ceased production, Gill never plugged the well. Gill's conduct allowed the underlying lease to terminate due to non-production. Gill then renegotiated a new lease with the land owner. The new lease was renegotiated and signed only four months after the previous lease and the Royals' interests had terminated. Having received a new lease, Gill then put the well back into production. The conduct and the timing of his actions support the chancellor's finding.
¶23. Gill also claims that paragraph 9 cannot be enforced against him because the provision is a personal covenant and does not run with the land. Gill argues that "[a]ll covenants having to do with realty and the use thereof are either real or personal. . . . A real covenant binds the heirs and assigns of the original covenantor, while a personal covenant does not. . . . Put another way, a covenant may `run with the land,' or may simply be a matter between the grantor and the purchaser." *421 Vulcan Materials Co. v. Miller, 691 So.2d 908, 914 (Miss.1997). Thus, Gill asserts that since he did not expressly agree to assume the royalty payment obligation, he is not bound to the terms of the assignment. The Royals counter that Vulcan Materials Co. also states that "since [the covenant in question] was a personal covenant, Vulcan contends that the provision is not enforceable to other parties unless ratified." Id. at 911. The court then ruled that "Vulcan is obligated to pay Miller the royalty pursuant to the royalty agreement not because it is a real covenant running with the land, but because Vulcan assumed the obligation in the deed to Granite." Id. at 915.
¶ 24. On August 26, 1997, Gill obtained his interest in the well from Trinity, and he continued production until October of 1998. During this time, Gill paid all royalties due the Royals. Clearly, as in Vulcan Materials Co., the assignee ratified and assumed the obligation of paragraph 9. This is what the chancellor found, and we believe it to be correct.
¶ 25. Gill's brief seems to argue that there was a different entity that negotiated the new lease with Lowe. In fact, the March 31, 1999 lease was executed by Lowe and conveyed the mineral interests to the Preston O. Gill Operating Company. Less than a year later, on February 8, 2000, Gill, individually and not on behalf of Preston O. Gill Operating Company, executed a document that assigned a ten percent working interest and ten percent net revenue interest in the lease to Lowe. In this assignment, Gill claimed that he was the owner of the entire working interest and net revenue interest of the A.L. Lowe # 1 well. Preston O. Gill Operating Company may or may not be a legal entity. However, the record before us does not support a finding that Preston O. Gill Operating Company was a legal entity that was separate and distinct from Gill.
¶ 26. Accordingly, we find that this issue is without merit. We affirm the judgment of the chancellor that awarded damages for past royalties and a continuing overriding royalty in the production of the well.
II. Whether the chancellor was manifestly wrong in finding the Royals were entitled to prejudgment interest.
¶ 27. Next, Gill challenges the chancellor's finding that the Royals were entitled to prejudgment interest. Gill claims that the Royals' failed to request such relief in their pleadings. The award of prejudgment interest is reviewed for abuse of discretion. Theobald v. Nosser, 784 So.2d 142, 145 (Miss.2001).
¶ 28. The requirements to be entitled to prejudgment interest are: (1) the claims for damages must be liquidated prior to judgment, and (2) the pleadings must reflect a request for prejudgment interest, including the date allegedly due. Moeller v. Am. Guar. & Liab. Ins. Co., 812 So.2d 953, 958 (¶ 11) (Miss.2002). The Royals' pleadings do not reveal a request for prejudgment interest.
¶ 29. However, Mississippi Rule of Civil Procedure 15(c) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." (emphasis added). Gill and the Royals entered stipulated evidence on the amount in dispute and the date that it was due. The written stipulation for this evidence included:
Each exhibit also shows the amount of interest at the rate of eight percent due on each royalty amount if the Court *422 should determine that interest should be awarded to the plaintiffs in this case.
The purpose of this Stipulation is to stipulate to the accuracy of the calculations reflected in these two exhibits. The defendants do not admit that any amount is owing to the plaintiffs nor do the defendants admit that prejudgment interest should be awarded by the court even if other amounts are awarded by the court.
¶ 30. Gill made no other objections to this stipulation. Gill now claims that these general reservations included in the stipulation served to preserve all claims to an award of prejudgment interest. Gill's reservation merely meant that he did not stipulate that the Royals were entitled to a certain amount. Gill did not object that the evidence of prejudgment interest was outside of the pleadings. Since he failed to make such objection, the evidence of liquidated damages and the date from which they were allegedly due was entered prior to judgment by the express or, at the very least, implied consent of the parties.
¶ 31. The stipulation served to satisfy the requirements for an award of prejudgment interest. Therefore, the chancellor did not abuse his discretion when he granted prejudgment interest. We find no merit to this issue.
III. Whether the chancellor erred when he granted punitive damages and attorney's fees.
¶ 32. Gill claims that the Royals failed to prove they were entitled to punitive damages by clear and convincing evidence. Mississippi Code Annotated Section 11-1-65(1)(a) (Supp.2006) provides that punitive damages are awarded only if the Royals prove by clear and convincing evidence that Gill acted with actual malice, fraud, or gross negligence/reckless disregard for the rights of others.
¶ 33. Here, the chancellor had sufficient evidence to support his finding that Gill acted in "reckless disregard" of the rights of the Royals. Gill was involved in the mineral lease ever since PRP, Inc.'s first offer to purchase the assignment from the Royals. He even received a direct interest in the proceeds of the well from PRP, Inc. after the assignment had been finalized. Later, he acquired full ownership of the lease. All this occurred while he was keenly aware of the automatic termination provision.
¶ 34. With knowledge that the automatic termination provision would take effect upon non-production of the well for sixty days, Gill stopped production. After only a few months had passed, contrary to the interest of the lease and the Royals' interest, Gill contacted the landowner to negotiate and obtain a new lease for the well. Thereafter, upon the execution of a new lease, Gill resumed production from the well. The Royals claimed that they were never informed that the well was to be shut down by Gill.
¶ 35. The chancellor found that the "net effect of that course of conduct was to terminate the interest of the [Royals] with full knowledge by Gill of what that result would mean to the [Royals], notwithstanding the specific language placed in Exhibit 2 to protect their interests." In accordance with the discretion that we give to a chancellor's fact findings, we find that there was substantial credible evidence to support his award of punitive damages. Therefore, Gill's allegation that the grant of punitive damages was in error is without merit.
¶ 36. Gill also argues that attorney's fees are appropriate only in cases were punitive damages should be awarded, and because punitive damages are not appropriate in this case neither are attorney's *423 fees. Since we have determined that the record supports an award of punitive damages, we also conclude that an award of attorney's fees was also appropriate.
IV. Whether the assignment provision violated the rule against perpetuities
¶ 37. Gill final issue argues that paragraph 9 should not be enforced because it would violate the rule against perpetuities. The rule against perpetuities requires that an interest must either definitely vest or definitely fail to vest within twenty-one years of some life in being at the time of the instrument. C & D Inv. Co. v. Gulf Transport Co., 526 So.2d 526, 528 (Miss.1988).
¶ 38. Gill argues that this Court should adopt the approach to the rule against perpetuities taken by Oklahoma courts. Oklahoma has held that if a provision of an instrument could violate the rule against perpetuities, then the provision will be void. Cities Service Oil Co. v. Sohio, 345 F.Supp. 28 (W.D.Okla.1972). We decline to adopt that approach in this particular case, because the Mississippi Supreme Court has previously held that if "the required contingency actually happens during the perpetuity period, the future interest is held valid." C & D Inv. Co., 526 So.2d at 529. Our approach is more of a "wait and see" approach to the rule against perpetuities.
¶ 39. If the chancellor did base his opinion on Gill's status as an agent of PRP, Inc., then the provision actually took effect within the time allowed by the rule. The provision granting the Royals an interest in the new lease actually took effect a mere eight years after the original instrument was created. Therefore, the provision in the assignment did not violate the rule against perpetuities in this case and this allegation of error is without merit.
¶ 40. THE JUDGMENT OF THE CHANCERY COURT OF PEARL RIVER COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.